UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KEVIN MURPHY,

        Plaintiff,

        -against-                **COMPLAINT WITH
JURY TRIAL DEMAND**
Civil Case No.: 18-cv-01218

ONONDAGA COUNTY, THE ONONDAGA COUNTY
SHERIFF'S DEPARTMENT, EUGENE CONWAY both
Individually and in his capacity as Sheriff of Onondaga County,
JOSEPH CICIARELLI both individually and in his capacity as
Chief Police Deputy, MICHAEL DICKINSON, JAMMIE
BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO,
ROY GRATIEN, JASON CASSALIA and CARL HUMMEL, all
individually and in their capacities as employees of Onondaga
County and the Onondaga County Sheriff's Department;
WILLIAM FITZPATRICK both Individually and in his
capacity as District Attorney of Onondaga County; STEFANO
CAMBARERI, both individually and in his capacity as an employee
and agent of both Onondaga County and William Fitzpatrick;
MELANIE S. CARDEN, both individually and in her capacity
as an employee of Onondaga County and LINDSEY M. LUCZKA,
both individually and in her capacity as an employee of Onondaga
County; BRYAN K. EDWARDS, both individually and in his capacity
as an agent of Onondaga County; WESTCOTT EVENTS, LLC both
individually and as an agent of Onondaga County,

        Defendants.
_____

1

## COMPLAINT

Plaintiff, Kevin Murphy, by and through his attorney, Jeffrey R. Parry, Esq., as and for his complaint, alleges as follows:

## NATURE OF THE ACTION

Plaintiff Kevin Murphy is, and was, an employee of the Defendant, Onondaga County in the Onondaga County Sheriff's Department located in Syracuse, County of Onondaga, State of New York. He currently holds the rank of Police Sergeant and was, until the defendants wrongly intervened, the supervisor of Onondaga County Sheriff's Deputies in the regular course of their business as police officers. His work for the Onondaga County Sheriff's Department and the community has, at all times, been exemplary.

This case concerns Defendants' Onondaga County, the Onondaga County Sheriff's Department, Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia, Carl Hummel, William Fitzpatrick, Stefano Cambareri,  Melanie S. Carden and Lindsey M. Luczka (hereinafter referred collectively as "Defendants") retaliation against Sgt. Murphy for his personal efforts in opposition to the insufficient and illegal policies, customs, practices and the deliberate indifference of the Onondaga County Sheriff's Department and Onondaga County, including efforts to disclose

inadequate and illegal police performance, supervision, training, procedures, negligence and gross negligence in the performance of police investigatory duties, improper and unconstitutional arrests, illegal seizures performed without a warrant, investigations, false record keeping, racially inappropriate behavior and personal and professional misconduct.

All of these acts rise from, and result in, conditions and policies which are damaging to the public safety as well as the safety of Sgt. Murphy. All of the acts and deprivations were known or should have been known to the defendant government entities, Onondaga County and the Onondaga County Sheriff's Department, and the other defendants as well. The inadequacies of current practices were obvious as was the likelihood that the federal rights of citizens would be sacrificed. Defendants, therefore, needed to act but did not thus, giving rise to liability for their deliberate indifference.

As a result of, and in retaliation for, Sgt. Murphy's personal efforts to call attention to the many shortcomings of Onondaga County and the Onondaga County Sheriff's Department, to protect the public safety, to advocate for change in improper and illegal policies, customs and deliberate indifference, to disclose these issues to supervisors, to elevate training to an acceptable level, to ensure that only lawful and appropriate arrests are made, to appropriately supervise and direct the

officers under his command, to enforce necessary record keeping and supervise his deputies such as to ensure the lawful conduct of their duties, to ensure the legal treatment of citizens and the observation of due process, Sgt. Murphy was relieved of his command, directed not to do police work of any kind, directed not to supervise subordinate deputies, was required to sit idly at a desk in public view without work, was forbidden to give orders or supervise subordinate officers unless other junior Police Sergeants took leave and officers were unavailable, was forbidden to make arrests, conduct investigations and do any of the duties that he was trained to do and which comprise his job as a Police Sergeant, was not allowed to utilize a patrol car and was embarrassed and humiliated in an effort to cause him to retire. Sergeant Murphy was given "road therapy" by being transferred to another station at an inconvenient location a long distance from his home so as to increase his commuting time every day. Further, he was made the subject of improper Hostile Work Environment investigations and disciplinary actions in an effort to cause him to be passed over after scoring highly on the lieutenants' exam in favor of Sergeants with less qualifications.

Finally, and most egregiously, he was, on two occasions, wrongly made the subject of a criminal investigation in order to punish him for raising issues of grave public and professional concern thus, giving rise to causes of action under the First

Amendment of the United States Constitution, 18 U.S.C. §§1961, *et seq.* (colloquially known as Civil RICO) and for further actions in fraud, slander and libel. 42 U.S.C. §1983; Labor Law §740; 18 U.S.C. §1964(c).

Particularly egregious are the actions of the defendant individuals, acting in concert, to retaliate against Sgt. Murphy by extortion via threat of criminal prosecution, to threaten his wife and otherwise place him in fear of incarceration, loss of employment, loss of his civil liberties, actual loss of income and professional opportunities and humiliation.

Additionally, and in addition to the numerous retaliatory actions enumerated above, Sgt. Murphy was passed over repeatedly for promotion to Lieutenant when he was the most qualified individual available. In each instance the promotion was given to individuals of demonstrably lesser ability and experience.

This is a civil action seeking damages arising out of Defendants' violation of the rights secured by the First Amendment of the United States Constitution, 42 USC §1983; 42 USC §1985 and 18 USC §§1961 *et seq.,* by Section 740 of the New York State Labor Law otherwise known as the Whistleblower Act, by Defendants' defamatory statements, by Fraud and by the negligent and intentional infliction of emotional distress.

## THE PARTIES

### PLAINTIFF -KEVIN MURPHY

1.      Plaintiff Kevin Murphy (hereinafter "Sgt. Murphy" or "Murphy") is an adult male who currently resides in the Northern District of New York.

2.      At all times relevant to this action, Plaintiff Murphy was, and is, an employee of Onondaga County and the Onondaga County Sheriff's Department serving as a Deputy with the rank of Sergeant.

3.      At all times relevant to this action, Plaintiff Murphy was, and is, an instructor at the Police Academy, an instructional facility owned and operated by defendants Onondaga County and the Onondaga County Sheriff's Department.

### DEFENDANTS

4. Defendant the County of Onondaga is a municipal corporation formed pursuant to the laws of the State of New York with offices located at 421 Montgomery Street, Syracuse, New York 13202.

5. Defendant Onondaga County Sheriff's Department is a police agency formed pursuant to Article 17 of the County Law with its principle place of business at 407 S State St, Syracuse, NY 13202. It is a subsidiary organization within the County of Onondaga.

6. Eugene Conway an adult male who resides in the Northern District of New York. He is the Sheriff of Onondaga County.

7. Joseph Ciciarelli is an adult male who resides in the Northern District of New York. He is Chief Deputy (Police Division) of the Onondaga County Sheriff's Office.

8. Michael Dickinson is an adult male who resides in the Northern District of New York. He is a captain in the Onondaga County Sheriff's Department and Patrol Commander.

9. Jammie Blumer is an adult female who resides in the Northern District of New York. At times relevant to this action, she was in a supervisory capacity over Sgt. Peluso.

10. Jonathan Anderson is an adult male that resides in the Northern District of New York. He is an employee of Onondaga County, a Lieutenant in the Onondaga County Sheriff's Department and a supervisor of police Sergeants.

11. Joseph Peluso is an adult male that resides in the Northern District of New York. At times relevant to this action, he was an employee of Onondaga County and the Onondaga County Sheriff's Department as a police sergeant. He has since retired as a police sergeant but is working as a Special Patrol Officer for the Sheriff's Office at the Onondaga County Civic Center.

7

12. Roy Gratien is an adult male that resides in the Northern District of New York. He is a retired employee of Onondaga County and the Onondaga County Sheriff's Department. He was formerly the Assistant Police Chief.

13. Jason Cassalia is an adult male that resides in the Northern District of New York. He is an employee of Onondaga County and the Onondaga County Sheriff's Department holding the position of Undersheriff.

14. Carl Hummel is an adult male that resides in the Northern District of New York. He is an employee of Onondaga County. At all times relevant to this action, he was the Acting Personnel Commissioner of the Onondaga County Department of Personal.

15. William Fitzpatrick is an adult male that resides in the Northern District of New York. He is an employee of Onondaga County. At all times relevant to this action, he was District Attorney of Onondaga County. Relevant is the fact that he often refers to himself as the senior law enforcement officer in Onondaga County.

16. Stefano Cambareri is an adult male that resides in the Northern District of New York. He is an employee of Onondaga County serving as administrator to the County operation and management contract with SMG in the operation of the Amphitheater, an attorney in private practice, a member of the Board of Directors

8

of the Syracuse OnCenter and, upon information and belief, a campaign manager for William Fitzpatrick.

17. Melanie S. Carden is an adult female residing in the Northern District of New York. She is an employee of Onondaga County. At all times relevant to this action, she was an Assistant District Attorney working at the Onondaga County District Attorney's Office.

18. Lindsey M. Luczka is an adult female residing in the Northern District of New York. She is an employee of Onondaga County. At all times relevant to this action, she was an Assistant District Attorney working at the Onondaga County District Attorney's Office.

19. Bryan Edwards is an adult male residing in the Northern District of New York. He is the manager and principal owner of Westcott Events, LLC. and, upon information and belief, the sole proprietorship of the same name.

20. Westcott Events, LLC is a limited liability company formed under the New York State Limited Liability Company law. Upon information and belief, it is presently suspended and/or operating as a sole proprietorship.

## JURISDICTION

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's New York State law claims under 28 U.S.C. § 1367.

## VENUE

22. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omission giving rise to Plaintiffs' claims occurred in this district and the Plaintiffs and Defendants reside in the Northern District of New York.

## JURY DEMAND

23. Plaintiff respectfully demands a trial by jury of all issues in this matter, including but not limited to damages.

## CONDITIONS PRECEDENT

24. A Notice of Claim was duly served upon the government entities Onondaga County and the Onondaga County Sheriff's Department within the appropriate time period and in accordance with General Municipal Law §50-e and §50i.

25. Over 30 days have elapsed since the service of this document and defendants have made no effort to settle the claim.

## FACTUAL ALLEGATIONS

26. At all times relevant to this action, plaintiff, Sgt. Kevin Murphy, was working as a police officer for the Onondaga County Sheriff's Department and Onondaga County.

27. As a supervisor, Sgt. Murphy was responsible for, *inter alia,* enforcing the law, responding to complaints by the public of criminal activity; training his subordinates as to how to perform their duties as police officers and ensuring compliance by his subordinates with the laws, rules, regulations, practices, policies, record keeping and other protocols required of a police officer and Sheriff's Deputy.

28. As an instructor at the Police Academy operated by the defendants Onondaga County and the Onondaga County Sheriff's Department, Sgt. Murphy was responsible for the instruction and education of aspiring deputies and police officers from numerous jurisdictions and locations in the subjects of law; appropriate, lawful and professional police work and other duties and responsibilities required of a professional police officer.  Sgt. Murphy has been identified as a subject matter expert as a gang investigator, has been granted

11

security clearances via extensive background investigations by the federal government and has taught at the local, state, national and international levels.

29. Sgt. Murphy has, and continues, to warn his superior officers in the Onondaga County Sheriff's Office of illegal arrests, inadequate police work, improper training, poor supervision, racially motivated behavior and improper, unprofessional and illegal conduct on the part of Sheriff's deputies.

30. At all times relevant to this action, Sgt. Murphy was qualified for his job as an Onondaga County Sherriff's Deputy.

31. At all times relevant to this action, Sgt. Murphy was qualified for a promotion to the rank of Lieutenant and to perform in that capacity as an Onondaga County Sheriff's Deputy.

32. At all times relevant to this action, Sgt. Murphy performed his job in a satisfactory manner.

33. Sgt. Murphy has been the subject of retaliation designed to quiet him, encourage him to leave the Police Department and otherwise punish him for the appropriate exercise of his constitutional rights, the policies of the Onondaga County Sheriff's Department, the law of the United States and the State of New York.

34. Exemplars of improper behavior on the part of Sheriff's Deputies and Retaliatory Behavior on the part of the Onondaga County Sheriff's Department are enumerated below. They display a distinct pattern of behavior and retaliation.

35. Each and every depiction is a proximate cause of the constitutional and civil deprivations, loss of income, hostile work environment, deliberate failure to promote and other retaliatory actions claimed herein.

36. On or about November 2, 2008, inmate Michael Tew committed suicide in the Onondaga County Justice Center.

37. Sgt. Murphy was assigned to investigate the cause of death and related involvement by Onondaga County and the Onondaga County Sheriff's Department.

38. Sgt. Murphy discovered, and reported, improprieties in the care and supervision of Michael Tew.

39. Sgt. Murphy reported these improprieties to supervising officers, including the Sheriff.

40. Thereafter, Sgt. Murphy discovered improprieties in the medical records of Michael Tew.

41. Specifically, the medical records had been altered.

42. Sgt. Murphy reported this to supervising officers as well as to the Onondaga County District Attorney. His report included the name of the perpetrator and a complete depiction of the criminal act of altering the records.

43. The District Attorney never brought criminal charges and, upon information and belief, the crime was never made public.

44. The perpetrator was allowed to quietly retire a few months later.

45. Thereafter, Murphy was himself charged with "losing" part of the criminal investigation records in this matter.

46. He was extensively investigated and the matter was brought before a union arbitrator.

47. The evidence relied upon by the County of Onondaga and the Onondaga County Sheriff's Department was deemed woefully inadequate and, after two years of litigation, the matter was dismissed.

48. This incident was the starting point for a decade of threats, constitutional deprivations, harassment and retaliation upon Sgt. Murphy.

49. On or about May 30th, 2015, Sgt. Murphy was the Day Sergeant (B Watch).

50. Murphy was dispatched to an Assault investigation that occurred during overnight hours.

14

52. No other deputies were available to respond.

53. The investigation involved the Timber Tavern bar where Murphy met the victim and her mother.

54. The victim informed Murphy that Sheriff's deputies had responded during the evening hours but had refused to take her statement and refused to investigate her complaint of physical assault and being chased by an individual armed with a Taser.

55. The victim believed that the lack of attention by police officers was due to her ethnic background and her sex. She is an African-American female.

56. Murphy immediately took the victim's statement, obtained surveillance evidence from within the bar, established probable cause against known suspects and submitted an arrest warrant application to the Court.

57. As the Court believed that probable cause existed, warrants for arrest were issued.

58. "Midnight" deputies improperly refusing to investigate for improper reasons and/or referring victims to daytime deputies is very common.

59. Murphy notified his supervisor, Lt. Caruso, of the investigation.

60. Murphy advised midnight Sergeant Peluso of the incident and the day shift investigation via email.

15

61. Murphy was asked by Peluso to hold the warrant application until the original investigating deputy could complete the application.

62. Peluso was informed that the investigation had been completed and the arrest warrant application had already been submitted and approved by the court.

63. A few days later, Peluso physically confronted Murphy and stated in an angry tone that when he "sixes" a complaint, it stays "sixed". ("sixed" refers in Police Clearing code radio parlance to "no report taken/matter settled on arrival" indicating, contrary to the evidence presented, that no investigation was necessary and none was conducted.)

64. Peluso, in his confrontation of Murphy, was loud, screaming and belligerent.   Murphy's demeanor was appropriate, calm and professional.

65. Peluso told Murphy that he doesn't know how to handle "hip-hop" parties. This statement was intended to convey that he, Murphy, doesn't know how or wasn't tough enough to handle young African-Americans.

66. The statement was calculated to be insulting and racially motivated as he, Murphy, had previously spent 12 years investigating criminal street gangs and organized crime and has been recognized as a gang expert by the US District Court in the North District of New York. He is well known and well liked amongst various minority groups in the Syracuse area.

16

67. After this inappropriate and loud confrontation initiated by Peluso, Murphy, with Caruso's consent, referred all future problems involving midnight shift matters to Lt. Blumer, Peluso's supervisor.

68. To avoid confrontation, and with Caruso's knowledge, Murphy avoided any contact with Peluso when at all possible.

69. On or about March 9, 2016, Sgt. Murphy informed Sheriff Eugene Conway of the improper use of a temporary holding cell to hold prisoners, the legal ramifications of holding a suspect in a temporary holding cell for an inordinate amount of time and possible legal exposure to the Onondaga County Sheriff's Office.

70. An inspection by the New York State Minimum Standards for Corrections made clear that the holding of prisoners for a lengthy period of time in the temporary holding cells at the Sheriff Substations, the Criminal Investigations Division and inside patrol cars was potentially violative of constitutionally protected rights of the accused.

71. The above inspection resulted in a Sheriff's Office written directive to avoid such constitutional issues. *See* WD G-D-1006-97 (hereinafter "the directive").

17

72. Sgt Murphy had documented a violation of the directive which occurred in September of 2015 and notified his chain of command as follows:

1) circumstances arose which caused a prisoner to be detained prior to arraignment for over four hours,

2) Sgt. Murphy directed that the prisoner be transferred to the Justice Center Jail, a constitutionally appropriate confinement facility, until arraignment could occur,

3) Custody Lieutenant Leland Guillaume refused to accept the prisoner although he was made aware of the directive and the prospect of civil liability by Sgt. Murphy.

4) Upon receipt of Murphy's memorandum, Assistant Police Chief Gratien made a determination that there was no violation of the directive, despite the clear conflict between the facts as presented and the directive.

73. In a meeting had on March 9, 2016, Sheriff Conway acknowledged the written directive and opined that Sgt. Murphy should have notified the Watch Commanders in both the Police and Custody Departments to ensure that it was followed.

74. Sgt. Murphy informed Sheriff Conway that he had informed the respective commanders.

75. Upon information and belief, Lt. Guillaume was never disciplined nor, was he notified that a prisoner's rights were likely violated or that the directive was ignored.

76. Lt. Guillaume was promoted to captain by Sheriff Conway on November 27, 2017.

77. Upon information and belief, Assistant Police Chief Gratien was never reprimanded or otherwise counseled for his failure to follow the directive or prematurely rejecting the allegation that a violation had occurred as acknowledged by Sheriff Conway.

78. On or about April 23, 2016, Murphy responded to an auto accident.

79. Importantly, Murphy was the first supervisor on the scene.

80. Sgt. Fredericka Mendolia also responded.

81. The facts of the investigation did not permit an "implied consent" search of the suspect's blood to determine intoxication as the injuries to the other driver were insufficient.

82. The suspect was injured and could not be interviewed.

83. By mutual agreement of Watch Commander Lt. Nerber, Sgt. Mendolia and Sgt. Murphy, a search warrant to procure blood from the suspect was to be applied for by Sgt. Murphy. The issuing Court authorized the search and seizure of the suspect's blood which had been taken routinely upon the suspect's admission to the hospital and was presently within the hospital's possession.

84. Sgt. Mendolia contacted a midnight deputy who was assigned to Sgt Peluso and requested that he execute the search warrant at the hospital and properly secure the suspect's blood which had been taken upon the suspect's admission to the hospital and was presently within the hospital's possession.

85. The midnight deputy was briefed on his duties by Sgt Mendolia twice.

86. Sgt. Murphy briefed the midnight deputy as to his duties once.

87. Nevertheless, the midnight deputy did not follow orders and, instead, caused blood to be illegally and unconstitutionally drawn without the suspect's consent in violation of the suspect's Constitutional rights and several State and Federal laws.

88. Sgt. Murphy advised the midnight deputy of his error, that blood was drawn without court order and in violation of the law, that the blood sample was useless to their investigation and inadmissible in court.

89. Murphy then dispatched another deputy to properly execute the warrant.

20

90. Murphy sought out the midnight deputy to identify the cause of the misunderstanding of Sgt. Mendolia's orders however, Lt. Blumer indicated that she would address the matter with the deputy.

91. Murphy was no longer involved in the investigation of the matter.

92. However, Murphy learned that the deputy and Sgt. Peluso falsified the police report to cover up the illegal search and seizure of the suspect's blood.

93. Murphy learned that, during the next midnight shift, Lt. Blumer and Sgt. Peluso contacted Sgt. Mendolia at home in a speakerphone telephone conference.

94. Present for this telephone conference was Assistant Chief Roy Gratien who was at the South Station for his Duty Commander shift.

95. Peluso and Blumer incorrectly and improperly intimated that Murphy's search warrant was improper, that his direction to the midnight deputy was insufficient, and Murphy was to blame for the illegal search committed by the midnight deputy.

96. Sgt. Mendolia rebuffed the assertion, stating she had requested Murphy's assistance, that Murphy's search warrant application was 'brilliant', and that she had contacted the midnight deputy and given him instructions for the execution of the search warrant.

21

97. On or about June 3, 2016, Captain Paula Pellizzari informed Murphy that, according to Assistant Police Chief Gratien, Murphy was not promoted to Lieutenant because he interferes with investigations of others.

98. Murphy requested that Captain P. Pellizzari investigate the allegations and specifically mentioned the Timber Tavern incident.

99. No investigation was ever completed.

100. Captain Pellizzari never replied to Murphy.

101. On or about August 10, 2016, Murphy is made aware of a hostile work environment complaint filed by Sgt. Peluso against him. The complaint, though vacuous, was specifically intended to prevent Sgt. Murphy from being promoted.

102. Murphy complains to Police Chief Joe Ciciarelli and Assistant Chief Gratien voicing that the complaint was done purely to initiate an Internal Affairs Investigation and thus, deny Murphy the opportunity for promotion. Both Ciciarelli and Gratien were made aware that the allegations were retaliatory and likely in violation of New York State Civil Service Law.

103. Prior to the complaint, Murphy was number one on the Lieutenant's list and a promotion to lieutenant was imminent.

104. Murphy explicitly requested a detailed investigation into the matter but, no investigation was initiated and he never even received a response to his request.

22

105. On or about August 17, 2016 Murphy had a lengthy meeting with Chief Joseph Ciciarelli.

106. Murphy informed Ciciarelli of the Timber Tavern incident and the racial and sexual discrimination involved.

107. Murphy informed Ciciarelli of the illegal blood seizure and that the illegal blood remained, improperly and illegally, in possession of the Onondaga County Sheriff's Office.

108. Murphy informed Ciciarelli of illegal and falsified reports filed by Peluso and the midnight deputy.

109. In discussing the seizure of the illegal blood, Murphy told Ciciarelli of Assistant Chief Gratien's personal knowledge of the illegal search and seizure due to his involvement as the Duty Commander and his presence at the South Station during the aforementioned telephone call to Sgt. Mendolia.

110. Ciciarelli informed Murphy that Gratien had not recorded the fact of the illegal search and seizure in his Duty Commander log for that night.

111. Murphy advised Ciciarelli of the conversation had with Captain P. Pellizzari wherein Gratien had expressed his opinion that Murphy should not be promoted due to his interference with other investigations even though the allegations were not investigated and were entirely unsubstantiated.

23

112.   Importantly, Murphy discussed his very great concern over the inordinate number of arrests made by the midnight deputies that were illegal for lack of probable cause.

113. Murphy had knowledge of the improper arrests as deputies assigned to Murphy were routinely used to conduct the morning arraignments of those arrested by the midnight deputies.

114.  Murphy specifically informed Ciciarelli that these repeated illegal arrests caused innocent people to be harassed, arrested and incarcerated.

115.  Murphy specifically mentioned an illegal arrest made by another midnight deputy, a subordinate of Peluso, who improperly arrested an African American female for a felony wherein probable cause was lacking, and he repeatedly refused to file any amended reports with the court.

116. Upon information and belief, Ciciarelli informed a fellow office that he had investigated the situation and discovered that some of Sgt. Murphy's allegations were true.

117. Murphy requested of Internal Affairs Commander Lt. Flanagan, a copy of the Hostile Work Environment memo.  It was not provided.

118. On or about August 29, 2016, Murphy was ordered to meet with Captain Dickenson and Lt. Caruso.

24

119. Murphy informed Captain Dickenson of the poor and illegal performance of "A" watch deputies, of their illegal arrests and improper or lacking paperwork.

120. He specifically mentioned that he had avoided contact with Peluso.

121. Captain Dickenson then specifically ordered Murphy to no longer do police work while under his command and specifically:

> 1) to refrain from initiating investigations including vehicle and traffic stops;
>
> 2) to no longer apply for search warrants and
>
> 3) to no longer prepare year-end statistics of Patrol Deputies work.

122. Murphy voiced his opinion that he was being disciplined without justification and that the restrictions would affect officer safety and public safety in general.

123. Caruso voiced his opinion that Murphy's supervision of his subordinates has consistently been excellent and that Murphy's personal involvement in police investigations never interfered with his ability to supervise his deputies.

124. Dickinson stated that Murphy improperly took the investigative lead into the unsolved assault of disabled, retired police sergeant Dan Budlong, though

he had done so at the request of the primary deputy, and while so encumbered with establishing probable cause and making an arrest, Dickenson alleged that Murphy failed to prevent a subordinate from putting gas in his patrol vehicle; even though the county gas pumps were in the deputies' patrol zone. As a result, Dickinson improperly asserted, the Sheriff's Department had lost out on a burglary investigation as the New York State Police arrived first and thus became the primary agency.

125. This fact was infuriating to Captain Dickinson who has repeatedly and publicly voiced that he has a personal issue against the New York State Police taking calls within Onondaga County.

126. In August and September 2016, Sgt. Murphy contacts Carl Hummel, the Acting Commissioner of Personnel for Onondaga County.

127. Murphy notifies Hummel of the illegal conduct Murphy reported to his superiors, the retaliatory and baseless Hostile Work Environment claim filed against Murphy by Peluso, and the orders to abstain from police work issued by Captain Dickinson.

128. Murphy requests an investigation by the Personnel Department as to the intentional interference with Murphy's Civil Service promotion status, and the intentional harassment by Peluso and Dickinson.

26

129. No investigation by Hummel or the Personnel Department ever ensues.

130. On or about September 1, 2016, Murphy was ordered to remove his personal file cabinet which deprives him of storage for subordinate files (required per department policy) as there were no other file cabinets available in the sergeant's office.

131. Chief Ciciarelli is specifically informed.

132. Chief Ciciarelli is specifically informed of Murphy's situation and that Murphy was ordered not to do police work, by Lieutenant Caruso.

133. In September 2016, Chief Ciciarelli initiates a conversation with Lt Caruso, inquiring into Murphy's situation. Caruso replied to the effect, [h]ow do you think he's doing; you took the one thing that he enjoyed doing here, police work, away from him.

134. On or about September 29, 2016 Murphy is again violently confronted by Peluso who yells at Murphy, bullying Murphy into a hostile interaction and belligerently demanding that Murphy speak to him.

135. Murphy leaves the building to avoid a confrontation without verbally responding to Peluso.

136. After Murphy leaves the building, Peluso becomes loud and belligerent with other deputies that work for Murphy on B Watch, entering a roll call room and sarcastically declaring that "they must be the only real cops".

137. Peluso then files a complaint against Murphy for ignoring him when, in fact, Murphy was trying to avoid a verbal and physical confrontation.

138. Murphy was told by Hummel to avoid Peluso and avoid the appearance of retaliation against Peluso for filing the Hostile Work Environment complaint.

139. Murphy is ordered to file a memo in which he informs his supervisor that Peluso was instigating a fight.

140. In the aftermath of the confrontation and related discussions, Murphy becomes sick and is admitted to a hospital with chest pains and high blood pressure.

141. On or about October 5, 2016, Dickinson writes a memo indicating that Murphy's assessment that Peluso complained of him to deny him a promotion are unfounded.

142. Dickinson indicated that it was a personality conflict and never mentioned the illegal activities pertaining to false arrests, incomplete investigations, illegal search and seizure, falsified police reports and Peluso's blatant belligerence.

28

143. After several weeks of illness due to chest pain, Murphy returns to work.

144. On October 6, 2016, Caruso is ordered to present Murphy with a memo accusing Murphy of "silent insolence" for simply avoiding a conflict with Peluso.

145. Caruso is ordered to provide this memo although he has informed Dickinson, Gratien, and Ciciarelli that Peluso was the instigator and aggressor.

146. Peluso also received a written reprimand and transfer for his conduct by Lt. Caruso, however, it is immediately countermanded by Captain Dickinson.

147. On October 7, 2016, Murphy is transferred such that he will be required to work on Thanksgiving and Christmas.

148. On or about October 14, 2016, Murphy files a complaint with the NYS Division of Human Rights indicating that he is the victim of retaliation because of his efforts to provide proper police service to an African-American woman, Jacinda Jones, the victim of the Timber Tavern assault.

149. In November of 2016, Murphy is assigned to Lt. Nerber.

150. There are already two sergeants in Lt. Nerber's command and Murphy has no one to supervise.

151. Murphy informs Nerber that Caruso has confirmed that the order for "no police work" stands and that he can be disciplined for not following it.

29

152. Unless one of the other two junior sergeants are off on leave, Murphy has no duties and no responsibilities and cannot independently perform any police related duties during his 10-hour shift.

153. Murphy has been an instructor at the Police Academy for over 20 years.

154. During the November, 2016 time period, Dickinson complained repeatedly that Murphy was instructing at the Police Academy.

155. As a direct result, Murphy's class schedule was reduced to just one class, Organized Crime Investigations, as Murphy is one of the few local instructors who are recognized in federal court as gang experts or have related subject matter expertise.

156. Peluso retires in January 2017 and Caruso requests that Murphy be allowed to return to his prior command. The request is refused by Dickenson.

157. Dickinson did not return or approve Murphy's 2016 performance evaluation, submitted by Caruso, although it was expected to be excellent.

158. On or about January of 2017, Murphy was requested by the Sheriff's Office Training Division to give a lecture during In-Service Instruction on Search Warrant basics to the entire OCSO police department. The lecture was met with high praise.

159. However, that Murphy is not personally allowed to be involved in the procurement of search warrants, even after being identified as a subject matter expert by the Training Division, becomes the subject of repeated sarcastic humor throughout the Police Department.

158. On or about June 24, 2017, Deputy Amy Murphy, an Onondaga County Sheriff's Police Deputy and wife of Kevin Murphy, while off duty, was struck by an unruly security guard and subjected to other untoward conduct while she was attending a concert with family at the Amphitheater located at Onondaga Lake.

159. The security company working the Amphitheater event was Westcott Events, LLC D/B/A Westcott Event Security Company. It is owned, operated and otherwise managed by Bryan Edwards.

160. Deputy Amy Murphy offered a *solicited opinion* to a security guard that he could not arrest someone for trespass for standing in mulch, nor arrest some of the men present at the concert for public indecency for being shirtless.

161. The security guard then pushed Deputy Amy Murphy.

162. Thereafter, the security guard pushed Amy Murphy a second time and asked if she was a cop. Deputy Amy Murphy identified herself as a police officer.

163. With children present, and in an effort to handle the situation prudently, Deputy Amy Murphy contacted the uniformed Police Supervisor at the venue to notify him of the incident instead of initiating an arrest on her own behalf.

164. Kevin Murphy was working at the venue in the capacity of Venue Supervisor.

165. Sgt. Murphy initiated an investigation of the incident by questioning those present including several other security guards. They admitted that there was physical contact initiated by the offending security guard towards off-duty Deputy Amy Murphy.

166. Sgt. Murphy's investigation was obstructed by the owner of the security company, Bryan Edwards, who physically pulled the offending security guard away from Sgt. Murphy's during the course of his investigation.

167. Sgt. Murphy terminated his investigation and discussion as he was called to a "rape in progress', deciding it more prudent to address the security guard issue with Captain Michael Pellizzari at a later time.

168. Sgt. Murphy reports the incident to Captain M. Pellizzari and is subsequently relieved of his duties at the Amphitheater based upon complaints made by the security company owner, Bryan K. Edwards, who stated that if Sgt.

Murphy works the venue in the future, the security company will walk off the job in violation of their contract.

169. Aside from Sgt. Murphy's initial inquiry, no investigation is ever undertaken by Captain M. Pellizzari or his amphitheater police staff. No report or arrest is ever made.

170. Upon information and belief, no effort is ever made by the Onondaga County Sheriff's Department to memorialize the incident and possible charges surrounding the use of physical force upon Deputy Amy Murphy, or the subsequent coercive and unlawful actions taken to deter and intimidate Sgt. Murphy by Onondaga County at the behest of Bryan Edwards.

171. Subsequently, Murphy is informed by a confidential informant and witness that the offending security guard is unlicensed.

172. Murphy confirms that the security guard, Anthony Colenzo, was an unregistered security guard with a serious and troubling criminal background, and that both Colenzo and Edwards are in violation of New York State General Business Law, both committing a misdemeanor; Colenzo for being employed as a Security Guard without being properly registered and Edwards for employing Colenzo when Colenzo was not properly registered.

173. Upon information and belief, the security guards involved in the above incident were employed by Westcott Events, LLC D/B/A Westcott Event Security Company.

174. Westcott Events, LLC is owned and operated by Bryan K. Edwards.

175. The individual appointed to supervise matters at the Amphitheater is Steve Cambareri, Esq., (hereinafter "Cambareri"), an attorney and part-time employee of Onondaga County.

176. Cambareri was, or is, a member of the Board of Directors of the Oncenter, the parent entity of the Amphitheater.

177. As well, upon information and belief, Cambareri is the campaign manager for Onondaga District Attorney William Fitzpatrick.

178. Mr. Cambareri, as a member of the Board of Directors and is in a position to influence the business practices of the On Center and the Amphitheater including the hiring of firms for security services.

179. Upon information and belief, Mr. Cambareri has a business relationship with Westcott Events.

180. Mr. Edwards' wife is known to work at Mr. Cambareri's private law firm.

181. Mr. Cambareri caused, was complicit in or, otherwise wrongly acquiesced in actions causing Sgt. Murphy to be relieved, upon threat of a walkout, at the request of Bryan Edwards and Westcott Events.

182. With several sources of employment associated with the Amphitheater, the OnCenter, Onondaga County and others associated with these facilities, Mr. Canbareri profits from these associations greatly.

183. In August of 2017, Sgt. Murphy receives an unsolicited contact from another Confidential Informant (hereinafter "CI1"), a woman, informing him that she had sexual relations with Captain Dickinson while she was underage.

184. Murphy knows this confidential informant as Murphy gave guidance to her for over a decade on leaving her former gang lifestyle and how to pursue a normal, productive life.

185. CI1 has previously been utilized by Sheriff's Criminal Investigations Division detectives, and, upon information and belief, has been identified and documented in Sheriff detective's court filings as a previously reliable confidential informant.

186. Murphy is further informed that the sexual relationship lasted for several years.

187. Murphy was further informed that CI1 resided with Captain Dickinson for a period of time, had met his son and that their relationship was conducted openly and in public.

188. Murphy was further informed that the CI1 no longer desired a relationship with Captain Dickinson.

189. Murphy was further informed that Captain Dickinson was stalking CI1, showing up at her various residences when she moved from time to time requesting to re-establish their sexual relationship.

190. Upon information and belief, Captain Dickinson utilized police assets on police time to locate and stalk CI1.

191. The CI1 informed Murphy that Dickinson was angry with Murphy because Murphy had positively influenced CI1 and caused her to assume a respectable lifestyle as a wife (in common-law fashion), mother and responsible member of the community.

192. CI1 informed Murphy that Dickinson blames Murphy for CI1 refusing to have further sex with him.

193. In spite of the rebuffs of the CI1, Dickinson continued to show-up at her home even after Dickinson arrested her significant other for DWI.

194. Murphy contacts an Inspector with the New York State Police Internal

36

Affairs Bureau, who informs Murphy that in order for the New York State Police to investigate a police officer from another agency they have to first get approval from the local District Attorney and the police agency head.

195. CI1 refuses to cooperate in bringing criminal charges due to family considerations and her now respectable lifestyle.

196. In September 2017, Murphy is later informed by Lieutenant Nerber that Lt. Anderson wanted to file a second 'silent insolence' charge against Sgt. Murphy for failing to acknowledge his salutation earlier that morning.

197. Sgt. Murphy advised Nerber that he never heard Anderson speaking to him.

198. Sgt. Murphy further advised Nerber that Pelsuo now works for Anderson as a Special Patrol Deputy at the Civic Center, that he considers this continued harassment by Peluso via Anderson, that Anderson has previously filed unsubstantiated internal affairs charges against Murphy, and that Anderson had received a public censure and rebuke from the police union (Onondaga County Sheriff's Police Association) for his unethical and improper investigations in violation of the collective bargaining agreement when he commanded the Professional Standards Unit (otherwise known as "Internal Affairs").

199. In November of 2017 Caruso requests Murphy's transfer to his former unit under Lt. Caruso to fill a sergeant's vacancy.

200. Captain Dickinson refused the transfer and tells Caruso that it is because Caruso had failed on previous occasions to properly supervise Murphy.

201. In November of 2016 and 2017, Murphy formally requests the transfer to his former watch per the Collective Bargaining Agreement and is formally denied for the second consecutive year.

202. On or about January 12, 2018, Murphy is told by Lt. Nerber that he was placed under surveillance by Captain Dickinson.

203. Murphy is informed that the investigation was initiated because Murphy allegedly didn't sign in to his assigned vehicle and left the station in his personal car.

204. Murphy is not informed who made the initial complaint and it is attributed to an unnamed co-worker.

205. In fact, Murphy did sign in to his assigned vehicle, he just didn't use the marked patrol car unless directed to act as a police supervisor.

206. Murphy offers a written explanation to Lt. Nerber.

207. Murphy verbally informs Lt. Nerber of his rationale for using his personal vehicle and leaving the station including, but not limited to, the fact that

he is, by order, forbidden to do police work and therefore the police vehicle as a tool is of no practical use, it only serves to misinform the public of a police presence and potentially places Murphy in danger as it draws public attention although Murphy is not allowed to act in the capacity of a police officer.

208. Murphy is then transferred to the North Station thus, adding thirty miles to his daily commute with Murphy having to drive past the South Station. In the parlance of local police officials, this is referred to as "road therapy".

209. Murphy is subsequently informed by his union representative that he is under criminal investigation and that the matter of the non-use of the marked vehicle may be referred to the District Attorney for prosecution.

210. Paradoxically, from January 2018 through June 2018, Dickinson directs that Murphy is not allowed to use a department vehicle and must use his own vehicle, with his uniform covered when out of the station for meal breaks, unless otherwise directed.

211. Formal charges related to this incident have not been forthcoming

212. On or about February 2, 2018, while working as a police supervisor, Murphy gave a formal order to two patrol deputies as to their conduct in an investigation. The orders from Sgt. Murphy were flagrantly disobeyed.

213. Lt. Nerber is informed of the insubordinate conduct and does not bring departmental disciplinary charges against the deputies.

214. Murphy is out sick from February 28, 2018 until March 18, 2018 for conditions related to stress caused by the above described workplace issues.

215. On March 18, 2018, upon returning to work, Murphy is ordered to inspect all thirty of the North Station patrol cars in contradiction to established policy.

216. The temperature on that day is 13 degrees and Murphy is dressed in a manner appropriate to the desk job previously ordered by Dickinson. Nevertheless, Murphy accomplishes the ordered task.

217. On or about June 11, 2018, Murphy is transferred back to Lt. Caruso's command.

218. Murphy requests that Lt. Caruso inquire of Capt. Dickinson if he is still ordered not to do police work.

219. On June 13th, 2018, Sgt. Murphy reports for duty and is given two counseling memos by Lt. Caruso at the direction of Captain Dickinson; the first counseling memo accused Murphy of intentionally misrepresenting Dickinson's orders from August 29th, 2016 as to Murphy not being allowed to do police work, and the second counseling memo detailing alleged violations of the duty manual

for not using a patrol car during work hours in January 2018.

220. In June of 2018, Murphy receives an exemplary employee review from Lt. Nerber.

221. Sgt. Murphy lodged a complaint with Carl Hummel, requesting an investigation and relief as to the hostile work environment issues and the discriminatory failure to reward him with a promotion.

222. In spite of a duty to do so, Hummel made no effort to investigate or ameliorate Sgt. Murphy's circumstances.

223. Peluso, Blumer, Anderson, Gratien, Ciciarelli, Cassalia, Dickenson and Conway, as members, employees, supervisors and agents of the Onondaga County Sheriff's Department and Onondaga County, and in their capacity as police officers, were operating under color a State law.

224. Hummel, as a member of the Onondaga County personnel department, was operating under color of State law.

225. In the aftermath of the filing of this lawsuit on October 11, 2018, Defendant Michael Dickinson contacted the confidential informant known as CI1 and threatened her with legal action.

226. In the aftermath of the filing of this lawsuit on October 11, 2018, Defendant Steve Cambareri was in contact with the confidential informant known as CI1 and directed her not to cooperate with this legal proceeding.

227. Upon information and belief, Defendant John Stephens contacted CI1 to continue to the communication on Dickinson's behalf.

228. Upon information and belief, both Stephens and Dickenson continue to contact friends of CI1 to influence her in not cooperating with this lawsuit.

229. After the filing of this lawsuit on October 11, 2018, plaintiff Murphy had several improper, unsupported and baseless referrals to the Onondaga County Sheriff's Office Internal Affairs Office which were ordered by Defendant Dickenson in his command capacity and received by Defendant Blumer as Internal Affairs Commander.

230. On November 9, 2018, Lt. Angelo Caruso was ordered by Dickenson to report on the criminal charges brought by Murphy against unlicensed security guards employed by Westcott Events. This action was to intimidate, embarrass and harass Murphy.

231. On November 10, 2018, Lt. Angelo Caruso was ordered by Dickenson to inquire if Murphy was conducting other investigations contrary to Dickenson's Order not to do police work.

42

232. On November 27, 2018, Lt. Angelo Caruso was ordered to complete a Member Misconduct Investigation on Murphy's filing against Westcott Event employees. Murphy was never served with the completed investigation.

233. On November 27, 2018, Lt. Angelo Caruso was ordered to complete a second Member Misconduct Investigation on Murphy's filing. In similar fashion, Murphy was never served with the completed investigation.

234. Upon information and belief, Defendant Conway requests District Attorney Fitzpatrick to institute an unwarranted criminal action against Murphy because it is impossible to silence him using "in-house" means.

235. On February 6, 2019, Plaintiff Murphy was sent a "Grand Jury Target" letter by defendant Lindsey M. Luczka. Upon information and belief, this action is at the direction of defendant William J. Fitzpatrick.

236. Defendants Luczka and Fitzpatrick knew, or should have known, that no probable cause existed to charge Murphy with any crime. In fact, he was being investigated for filing the criminal complaints that lead to the arrest of those unlicensed security guards that assaulted Mrs. Murphy.

237. Upon information and belief, the investigation and subsequent letter were wrongly instigated by William Fitzpatrick.

43

238. William Fitzpatrick was informed and knew that the investigation lacked probable cause or legitimate purpose.

239. Murphy's union representative informed Murphy that it was their intention not to represent him in defending against these criminal charges, frivolous or not.

240. Upon information and belief, this was one of the intentions of the defendants in resorting to false criminal proceedings.

241. On April 19, 2019, plaintiff Murphy filed a new Notice of Claim informing the defendants of additional causes of action.

242. On April 24, 2019, plaintiff Murphy was transferred without legitimate reason to such a position that would cause him to lose secondary employment opportunities and an immediate loss of income.

243. On April 29, 2019, Defendant Melanie Carden made a telephone call to Murphy's wife, Deputy Amy J. Murphy, to discuss the investigation of Sgt. Murphy, Murphy's possible arrest and to request her presence in the District Attorney's Office for an interview.

244. Deputy Amy J. Murphy was threatened by this conversation and recognized it as an attempt to intimidate her. As such, she did not comply with the request.

44

245. In the aftermath of the above mentioned incidents, and in spite of his exemplary career, for bringing illegal and improper acts on the part of the defendants to light Murphy has been forbidden to do police work, relieved of his command and duties, forbidden to give orders, required to sit at a desk during his entire shift doing nothing whatsoever, forbidden to use a patrol car, been required to hide his uniform while in public, been subject to threatening and abusive behavior by other police officers, been deprived of police assistance and actually castigated for his efforts when his fellow police officer and wife was menaced and assaulted in a public place, has had his opportunities for overtime pay drastically reduced, has been ordered to undertake menial tasks under circumstances that were deliberately chosen to cause him physical discomfort and agitation, has been deliberately and repeatedly passed over for promotion to lieutenant in favor of individuals with lesser qualifications, has been threatened by repeated unwarranted police and grand jury investigations, has been arbitrarily transferred and otherwise moved about in his job assignments such as to intimidate him and deprive him of income, has been subjected to public ridicule and embarrassment and the intentional infliction of emotional stress such as to cause him mental and physical harm.

246. In contrast, unabated and continuing, those individual deputies, supervisors and civilians who have engaged in improper and illegal conduct have neither been disciplined, retrained or properly supervised such as to avoid a reoccurrence of improper police work, resulting in numerous other arrests of local citizens lacking in probable cause, inappropriate application of the law and the loss of citizens rights and property and, most importantly, jeopardizing the public safety. Incredibly, rather than remedy the improper police work and shoddy supervision identified by Sgt. Murphy, defendant's have resorted to a form which, once signed by the unknowing civilian under arrest, is intended to absolve them of liability for their improper and illegal conduct.

247. Moreover, William Fitzpatrick, Melanie S. Carden, Lindsey M. Luczka and others yet to be named in the Onondaga County District Attorney's Office have improperly and illegally sought to intimidate Sgt Murphy through the abuse of the Grand Jury process, their position as public servants and attorneys at law, the sworn duties of their office, the laws of the United Stated of America, the United States Constitution and the State of New York.

**FIRST CAUSE OF ACTION**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**18 U.S.C. §1964**
**EUGENE CONWAY, JOSEPH CICIARELLI, MICHAEL DICKINSON,**
**JAMMIE BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO, ROY**
**GRATIEN, JASON CASSALIA, CARL HUMMEL, WILLIAM**
**FITZPATRICK, MELANIE S. CARDEN and LINDSEY M. LUCZKA all**
**individually as well as in their capacities as employees of Onondaga County**
**and the Onondaga County Sheriff's Department; BRYAN K. EDWARDS,**
**both individually and in his capacity as an agent of Onondaga County.**

249. Plaintiff realleges and restates paragraphs 1 through 248 as if more fully set forth herein.

250. At all relevant times, defendants Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia, Carl Hummel, Stefano Cambareri, William Fitzpatrick, Melanie S. Carden, Lindsey M. Luczka and Bryan K. Edwards constituted an "enterprise" within the of 18 U.S.C. §§1961(4) and 1962(c) in that they are "an association" and/or a "group of individuals associated in fact".

251. Defendants Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia,

Carl Hummel, Stefano Cambareri, William Fitzpatrick, Melanie S. Carden, Lindsey M. Luczka and Bryan K. Edwards are "persons" within the meaning of 18 U.S.C. §§1961(4) and 1962(c) in that they are individuals or entities capable of holding a legal or beneficial interest in property.

252. Defendants Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia, Carl Hummel, Stefano Cambareri, William Fitzpatrick, Melanie S. Carden, Lindsey M. Luczka and Bryan K. Edwards have acquired and maintain interest and control of the enterprise via racketeering activity. That is, they have maintained their control through illegal threats, frivolous investigations, arrests and intimidation of the citizens of Onondaga County, Sgt. Murphy and his family included, so as to protect their positions and accrue income. To accomplish this, they have harmed numerous citizens by violating their civil rights and injured Sgt. Murphy by loss of income, loss of additional employment (moonlighting), loss of overtime pay, loss of a promotion, onerous legal expenses, infringement upon his constitutional rights, professional embarrassment and harassment. Defendant's actions are the direct and proximate cause of Sgt. Murphy's business and property losses.

253. Between 2011 and the present day, Defendants Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia, Carl Hummel, Stefano Cambareri, William Fitzpatrick, Melanie S. Carden, Lindsey M. Luczka and Bryan K. Edwards (hereinafter "the enterprise") sought to extort Sgt. Murphy via conduct involving intimidation, threats, fraud, wrongful and illegal acts, illegal use of the position of District Attorney and illegal use of the grand jury process for his actions in reporting the wrongdoings of the enterprise and the illegal activities born by the many citizens abused by illegal law enforcement methods as enumerated above and, in doing so, jeopardizing their political positions, jobs, election prospects, promotion prospects and income.

254. Defendant's acts demonstrate a pattern of racketeering activity almost to the point of being redundant. Their repeated actions have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. In fact, they are the standard way in which the defendant's do business.

255. Specifically, their repeated acts occur whenever Sgt. Murphy uncovers or exposes an illegal act, one of political embarrassment or an act of professional wrongdoing. Immediately thereafter, Sgt. Murphy will either have the exposed

wrongdoing attributed to him or he will be frivolously accused of some other perfectly benign act in an effort to silence him. As Sgt. Murphy is sworn to uphold State and Federal law, he is put in the impossible position of either reporting the act as duty requires or ignoring it to avoid the intimidating efforts of the enterprise.

256. The pattern of racketeering activity includes actions for obstruction of justice, 18 U.S.C. §1503; Mail Fraud, 18 U.S.C. §1341; Wire Fraud, 18 U.S.C. §1343; Tampering with a Witness, 18 U.S.C. §1512; Interference with Commerce by Threats or Violence, 18 U.S.C. §1951 otherwise known as the Hobbs Act.

257. Said pattern of racketeering activity poses an "open ended" threat to a large number of individuals as said actions, attempts to cover-up corruption, illegal arrests and misconduct pose a threat to the entire community, have been occurring for many years and show no signs of abating. In his capacity as a B watch supervisor, Sgt. Murphy witnessed arrests without probable cause of innocent central New York citizens for years.

258. The conduct was directed and controlled by each of the defendants named, each voluntarily and willing participating and each having managerial control over the enterprise.

259. The pattern of activity has existed for several decades however, the pattern of activity experienced by Sgt Murphy extends for a ten-year period.

260. Overt acts attributed to the enterprise include all of those acts enumerated in paragraphs 26 to 247 above.

## SECOND CAUSE OF ACTION
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT CONSPIRACY TO VIOLATE 18 U.S.C. §1964
## EUGENE CONWAY, JOSEPH CICIARELLI, MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA, CARL HUMMEL, WILLIAM FITZPATRICK, MELANIE S. CARDEN and LINDSEY M. LUCZKA all individually as well as in their capacities as employees of Onondaga County and the Onondaga County Sheriff's Department; BRYAN K. EDWARDS, both individually and in his capacity as an agent of Onondaga County.

261. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

262. The defendants herein willingly joined the conspiracy.

263. Each defendant enumerated agreed to participate in the predicate acts.

264. Each defendant enumerated knew or should have know that their actions in participating in the predicate acts was illegal and done with the purpose of forwarding the interests of the enterprise.

265. Defendant's acts continue to this day and in spite of the fact that Sgt. Murphy initiated a suit.

266. The conspiracy to commit the pattern of racketeering activity includes actions for obstruction of justice, 18 U.S.C. §1503; Mail Fraud, 18 U.S.C. §1341; Wire Fraud, 18 U.S.C. §1343; Tampering with a Witness, 18 U.S.C. §1512; Interference with Commerce by Threats or Violence, 18 U.S.C. §1951 otherwise known as the Hobbs Act.

**THIRD CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION AGAINST DEFENDANTS ONONDAGA COUNTY, THE ONONDAGA COUNTY SHERIFF'S DEPARTMENT, EUGENE CONWAY, JOSEPH CICIARELLI, MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA, CARL HUMMEL, WILLIAM FITZPATRICK, MELANIE S. CARDEN and LINDSEY M. LUCZKA all individually as well as in their capacities as employees of Onondaga County and the Onondaga County Sheriff's Department.**
**(42 U.S.C. §1983)**

195. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

267. To protect the safety of our citizenry and to instill confidence in the police and the judicial system, police officers must be required to know and obey the law.

268. Poorly trained police officers, inevitably and repeatedly break laws in attempting to do their jobs.

269. Moreover, the constitutional rights and the safety of citizens are endangered by police officers that are poorly supervised and poorly trained.

270. Concerned about inadequate training, inadequate supervision and compromised leadership, Sgt. Murphy complained about improper arrests and wrongful police conduct that came to his attention.

271. Sgt. Murphy's complaints were, and are, an exercise of his First Amendment right to free speech on a matter of grave public concern.

272. Sgt. Murphy's complaints as to inadequate training, supervision and discipline of police officers is a matter of grave public concern.

273. Sgt. Murphy's reports on the failure of Sheriff's Deputies to investigate and to make necessary reports is an exercise of his right to free speech in a matter of grave public concern.

274. Sgt. Murphy's reports on the engagement of police officers in racially motivated conduct is an exercise of his right to free speech in a matter of grave public concern.

275. Sgt. Murphy's reports on the improper conduct of police officers engaging in sexual acts with minors and/or confidential informants is an exercise of free speech on a matter of grave public concern.

276. Sgt. Murphy's reports on improper police conduct in the improper search and seizure of blood without a judicial warrant is an exercise of free speech on a matter of grave public concern.

277. Sgt. Murphy's reports on the illegal and unconstitutional use of an inadequate holding cell is a matter of grave public concern.

278. In retaliation, defendants isolated, shunned, defamed, and retaliated against the Plaintiff because he exercised his First Amendment Right to Freedom of Speech on matters of grave public concern.

279. In retaliation, defendants further punished Sgt. Murphy in an attempt to cause him to resign by transferring him to a duty station that was at an extended distance from his home, ordered him not to engage in police work and professional activity and deprived him of any supervisory duties.

280. In retaliation, defendants further ignored the above described criminal assault involving Sgt. Murphy's wife, refused to investigate the incident involving her and removed him from his duties for his attempts to make a report.

281. In retaliation, defendants, on several occasions, caused Sgt. Murphy to be deprived of a promotion in favor of lesser qualified individuals.

282. In retaliation, defendants caused Sgt. Murphy's time as an instructor at the Police Academy to be drastically reduced.

283. In retaliation, defendant's caused Sgt. Murphy's overtime hours to be reduced such as to grossly limit his income.

284. In retaliation, defendants caused Sgt. Murphy to hide his uniform from public view while traveling to and from work and during the workday while in public.

285. In retaliation, Defendants ordered Sgt. Murphy to not do police work and to sit idly at a desk, in plain sight, with nothing to do.

286. All of the actions taken by the Defendants referred to herein were taken while acting under the color of law and had the effect of depriving Plaintiffs of rights secured by the First Amendment to the United States Constitution.

287. Defendants' adverse actions were motivated in response to the exercise of Plaintiffs' constitutional rights.

288. Defendants' adverse actions caused the Plaintiff to suffer damages and injuries, including but not limited to lost opportunities, pain and suffering, emotional distress, anxiety and loss of pay and benefits.

289. The acts of Defendants have permanently harmed the professional and personal reputation of the Plaintiff.

290. The acts of Defendants were done especially maliciously and/or recklessly, entitling Plaintiffs to recover punitive and compensatory damages.

**FOURTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF THE FIRST AMENDMENT**
**OF THE UNITED STATES CONSTITUTION AGAINST DEFENDANTS**
**ONONDAGA COUNTY, THE ONONDAGA COUNTY SHERIFF'S**
**DEPARTMENT, EUGENE CONWAY, JOSEPH CICIARELLI, MICHAEL**
**DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON, JOSEPH**
**PELUSO, ROY GRATIEN, JASON CASSALIA, CARL HUMMEL,**
**WILLIAM FITZPATRICK, MELANIE S. CARDEN and LINDSEY M.**
**LUCZKA all individually as well as in their capacities as employees of**
**Onondaga County and the Onondaga County Sheriff's Department.**
**(42 U.S.C. §1983)**

291. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

292. Defendants instituted a criminal investigation against the Plaintiff because he exercised his First Amendment Right to Freedom of Speech on matters of grave public concern.

293. Defendants isolated, shunned, defamed, and retaliated against the Plaintiff because he exercised his First Amendment Right to Freedom of Speech on matters of grave public concern.

294. Defendants caused the Plaintiff to lose a promotion because he exercised his First Amendment Right to Freedom of Speech on matters of grave public concern.

295. Thereafter, defendant's threatened the Plaintiff with Grand Jury Action in a subsequent investigation.

296. Defendant sought to justify this investigation and threat to indict the Plaintiff by his wholly legitimate actions in filing a complaint and conducting an investigation against defendants Bryan Edwards, Westcott Events and their employees who had struck his wife.

297. All of the actions taken by the Defendants referred to herein while acting under the color of law and had the effect of depriving Plaintiffs of rights secured by the First and Fourteenth Amendments to the United States Constitution.

298. Defendants Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia and Carl Hummel knew or should have known of the illegal and improper treatment of the Plaintiff.

299. Defendants William Fitzpatrick, Mellanie S. Carden and Lindsey M. Luczka knew or should have known of the illegal and improper treatment of the plaintiff.

300. In his position as Sheriff, Defendant Conway was obligated to address, stop, and prevent the illegal treatment of the Plaintiff and was deliberately indifferent to the illegal acts presented to him.

301. Defendant Conway failed and/or deliberately refused to address, stop, and prevent the illegal treatment of the plaintiff and the illegal acts of his department.

302. Defendant Joseph Ciciarelli knew or should have known of the illegal and improper treatment of the plaintiff.

303. Defendant Ciciarelli knew or should have known that the aforementioned investigation and actions were pursued with illegal and retaliatory motives.

304. Defendant Ciciarelli in overseeing the investigation was obligated to address, stop, and prevent the illegal and retaliatory actions taken against the Plaintiff and he was deliberately indifferent to the illegal acts presented to him.

305. Defendant Ciciarelli failed and/or deliberately refused to address, stop, and prevent the illegal and retaliatory actions taken against the Plaintiff.

306. Defendant Michael Dickinson knew or should have known of the illegal and improper treatment of the plaintiff and he was deliberately indifferent to the illegal acts presented to him.

307. Defendant Dickinson knew or should have known that the aforementioned Investigations and actions were pursued with illegal and retaliatory motives.

308. Defendant Dickinson in overseeing the investigation was obligated to address, stop, and prevent the illegal and retaliatory actions taken against the Plaintiff.

309. Defendant Dickinson failed and/or deliberately refused to address, stop, and prevent the illegal and retaliatory actions taken against the Plaintiff.

310. All of the actions taken by the Defendants referred to herein while acting under the color of state law and had the effect of depriving the Plaintiff of rights secured by the First Amendment to the United States Constitution.

59

311. Defendants' adverse actions were motivated in response to the exercise of Plaintiffs' constitutional rights.

312. Defendants' adverse actions caused the Plaintiff to suffer damages and injuries, including but not limited to lost opportunities, pain and suffering, emotional distress, anxiety and loss of pay and benefits.

313. The foregoing damages and injuries were calculated to chill a person of ordinary firmness from continuing to exercise his/her right to free speech.

314. The acts of Defendants have permanently harmed the professional reputation of the Plaintiff.

315. The acts of Defendants were done especially maliciously and/or recklessly, entitling the Plaintiff to recover punitive and compensatory damages.


**FIFTH CAUSE OF ACTION**
**CONSPIRACY TO RETALIATE IN VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION AGAINST DEFENDANTS ONONDAGA COUNTY, THE ONONDAGA COUNTY SHERIFF'S DEPARTMENT, EUGENE CONWAY, JOSEPH CICIARELLI, MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA and CARL HUMMEL, WILLIAM FITZPATRICK, MELANIE S. CARDEN and LINDSEY M. LUCZKA all individually as well as in their capacities as employees of Onondaga County and the Onondaga County Sheriff's Department.**

60

## (42 U.S.C. §1985)

316. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

317. Defendants wrongly and incorrectly defamed, slandered and libeled Sgt. Murphy in an effort to silence him by stating, amongst other things, that he interfered with the investigations of others, that he did not know how to conduct investigations; that he did not know how to procure, and had improperly procured, a judicial warrant; that he was "silently insolent", that he had created a hostile work environment, that he took the investigative lead in the Budlong investigation; that he didn't sign in to his personal patrol vehicle and that he misrepresented Dickenson's orders not to do police work.

318. Thereafter, and based upon this tortious conduct, defendants further retaliated and attempted to silence Sgt. Murphy by causing him to be passed over for promotion, causing him to be transferred, causing him to be isolated, shunned, embarrassed, defamed and caused damage to his personal and professional reputation all because he exercised his First Amendment Right to Freedom of Speech on matters of grave public concern.

319. All of defendant's acts of defamation, slander and libel were based upon statements that were untrue and known to be untrue.

320. All of the actions taken by the Defendants referred to herein while acting under the color of law as police officers and public officials and were published with the purpose of depriving the Plaintiff of rights secured by the First Amendment to the United States Constitution.

321. To accomplish these ends, Defendants Eugene Conway, Joseph Ciciarelli, Michael Dickinson, Jammie Blumer, Jonathan Anderson, Joseph Peluso, Roy Gratien, Jason Cassalia, Carl Hummel, William Fitzpatrick, Mellanie Carden and Lindsey Luczka entered into a corrupt agreement to injure Sgt. Murphy, deprive him of his Constitutional rights, his promotion, his status in the professional community and his good name.

322. The preceding paragraphs contain numerous exemplars of overt acts done in furtherance of the corrupt agreement. As well, however, attention is specifically drawn to the following overt acts:

1) Gratien, Bloomer and Peluso engaged in an afterhours discussion pertaining to the illegal seizure of blood in the aforementioned accident investigation. *See* paragraphs 71 -75. This collusion resulted in the falsified   police

report and an attempt to place the blame on Murphy as depicted in more detail above.

2)   Anderson, following Peluso's lead, initiated a similar, if not identical, hostile work environment complaint for "silent insolence".

3) Dickenson's Order that Murphy not do police work was followed by every defendant without question or appropriate investigation. Hummel did not investigate as well even though he is outside the Sheriff's chain of command and tasked with addressing human resource issues.

4) Fitzpatrick, Carden and Luczka wrote Sgt. Murphy and, in a separate effort, called his wife to threaten him with arrest and indictment.

323. Defendants' adverse and wrongful actions and their corrupt agreement were motivated in response to Murphy's exercise of his constitutional rights.

324. Defendants' adverse actions caused the Plaintiff to suffer damages and injuries, including but not limited to lost employment and professional opportunities, loss of income, pain and suffering, emotional distress, anxiety and loss of pay and benefits.

325. The acts of Defendants have permanently harmed the professional reputation of the Plaintiff as well as his personal reputation in the community.

326. The acts of Defendants were done especially maliciously and/or recklessly, entitling the Plaintiff to recover punitive and compensatory damages.

**SIXTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF THE ARTICLE 1, SECTION 8**
**OF THE CONSTITUTION OF THE STATE OF NEW YORK AGAINST**
**DEFENDANTS ONONDAGA COUNTY, THE ONONDAGA COUNTY**
**SHERIFF'S DEPARTMENT, EUGENE CONWAY, JOSEPH CICIARELLI,**
**MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON,**
**JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA, CARL HUMMEL,**
**WILLIAM FITZATRICK, MELLANIE S. CARDEN and LINDSEY**
**LUCZKA all individually as well as in their capacities as employees of**
**Onondaga County and the Onondaga County Sheriff's Department.**

327. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

328. Article 1, Section 8 of the New York State Constitution declares unequivocally that "[e]very citizen may freely speak, write and publish his or her sentiments on all subjects".

329. Sgt. Murphy spoke to his supervisors repeatedly of the shortcomings in training, supervision, policy and conduct of patrol units operating throughout the Onondaga County area.

330. Sgt. Murphy unequivocally made it known that defendants Onondaga County and the Onondaga County Sheriff's Department had instituted training

programs and methods of supervision that were inadequate and led to numerous false arrests of citizens during A watch.

331. Sgt. Murphy told his supervisors of arrests made without probable cause, illegal search and seizure, falsified and improper record keeping, racially motivated conduct, lack of training, lack of supervision and lack of required counseling/ re-training to cure the many shortcomings.

332. Concerned about inadequate training, inadequate supervision and compromised leadership, Sgt. Murphy complained about improper arrests and wrongful police conduct that came to his attention.

333. Sgt. Murphy's complaints were, and are, an exercise of his Article One, Section 8 right to free speech on a matter of grave public concern.

334. Sgt. Murphy's complaints as to inadequate training, supervision and discipline of police officers is a matter of grave public concern.

335. Sgt. Murphy's reports on the failure of Sheriff's Deputies to investigate and to make necessary reports is an exercise of his right to free speech in a matter of grave public concern.


336. Sgt. Murphy's reports on the engagement of police officers in racially

65

motivated conduct is an exercise of his right to free speech in a matter of grave public concern.

337. Sgt. Murphy's reports on the improper conduct of police officers engaging in sexual acts with minors and/or confidential informants is an exercise of free speech on a matter of grave public concern.

338. Sgt. Murphy's reports on improper police conduct in the improper search and seizure of blood without a judicial warrant is an exercise of free speech on a matter of grave public concern.

339. Sgt. Murphy's reports on the illegal and unconstitutional use of an inadequate holding cell is a matter of grave public concern.

340. All of the unprofessional behavior identified by Sgt. Murphy constituted matters of grave public concerned as innocent people were arrested and detained, illegal and wrongful conduct was uninvestigated and ignored and the level of training and supervision continued to deteriorate.

341. In retaliation, Sgt. Murphy was ordered not to do police work, was relieved of his command, was not permitted to utilize a patrol car or appear in public while in uniform, was deprived of a well-earned promotion, was transferred to inconvenient locations, was not permitted to supervise patrol officers, was forced to sit idly at a desk with no work and in plain sight of his fellow officers,

was deprived of opportunities to earn overtime compensation, his wife was deprived a adequate and appropriate police protection, he was relieved of almost all of his teaching and instructional responsibilities, he was humiliated, insulted and threatened.

342. In further retaliation, Sgt. Murphy's requests for an investigation into the retaliation he was experiencing, the hostile work environment he was forced to endure, his loss of overtime, transfers to inconvenient locations, the failure to investigate the circumstances surrounding the assault upon his wife and the other circumstances delineated above were refused or ignored.

343. Defendants' adverse and wrongful actions were motivated in response to Murphy's exercise of his rights under Article One, Section 8 of the Constitution of the State of New York.

344. Defendants' adverse actions caused the Plaintiff to suffer damages and injuries, including but not limited to lost employment and professional opportunities, loss of income, pain and suffering, emotional distress, anxiety and loss of pay and benefits.

345. The acts of Defendants have permanently harmed the professional reputation of the Plaintiff as well as his personal reputation in the community.

346. The acts of Defendants were done especially maliciously and/or recklessly, entitling the Plaintiff to recover punitive and compensatory damages.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF RIGHTS SECURED BY THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AGAINST DEFENDANTS ONONDAGA COUNTY, THE ONONDAGA COUNTY SHERIFF'S DEPARTMENT, EUGENE CONWAY, JOSEPH CICIARELLI, MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA, CARL HUMMEL, WILLIAM FITZPATRICK, MELLANIE S. CARDEN and LINDSEY LUCZKA all individually as well as in their capacities as employees of Onondaga County and the Onondaga County Sheriff's Department.**
**(42 U.S.C. §1983)**

347. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

348. Plaintiff is entitled to the equal protection of the laws pursuant to the Fourteenth Amendment of the United States Constitution.

349. By engaging in the foregoing conduct, Defendant have violated rights guaranteed to the Plaintiffs under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in that the Plaintiff was deprived of police protection because of the malicious, self-serving, defamatory acts, omissions and statements of the defendants.

350. Sgt Murphy was deprived of the internal affairs investigation, personnel investigations and competent criminal investigation necessary to bring forth factual determinations, appropriate charges and allegations in criminal court as well as to guarantee his personal safety and the safety of his family.

351. All of the actions taken by Defendants were done while acting under color of state law and had the effect of depriving Sgt. Murphy of his rights to equal protection under the laws as secured by the Constitution and the laws of the United States and specifically the Fourteenth Amendment.

352. The actions of the Defendants have resulted in emotional injury to the Plaintiffs and constitute malicious and/or reckless behavior, entitling Plaintiff to recover punitive and compensatory damages.

**EIGHTH CAUSE OF ACTION**
**DEFAMATION, DEFAMATION PER SE, SLANDER, LIBEL AGAINST**
**DEFENDANTS ONONDAGA COUNTY, THE ONONDAGA COUNTY**
**SHERIFF'S DEPARTMENT, EUGENE CONWAY, JOSEPH CICIARELLI,**
**MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON,**
**JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA, CARL HUMMEL,**
**WILLIAM FITZPATRICK, MELLANIE S. CARDEN, LINDSEY LUCZKA**
**and BRYAN EDWARDS all individually as well as in their capacities as**
**employees of Onondaga County and the Onondaga County Sheriff's**
**Department.**

353. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

354. On several occasions after the issue arose of possible illegal acts and violations related to various Sheriff's Deputies under their command, defendants maliciously and willfully defamed the Plaintiffs by making statements which they knew to be false and fraudulent.

355. Said statements were published to third parties both verbally and in writing.

356. Said statements were made without the knowledge or consent of Sgt. Murphy.

357. Said statements were made both intentionally, with the specific intent to injure Sgt. Murphy, and negligently.

70

358. Said statements were meant to maliciously degrade, humiliate and harm Sgt. Murphy, to cause him to retire prematurely and to hurt his reputation in the law enforcement community.

359. Said statements were made with malicious disregard for the truth.

360. Exemplars of Defendant's false statements include, but are not limited to, the following:

1) That Sgt. Murphy interferes in the investigations of others;

2) That Sgt. Murphy was to blame for the illegal seizure of the blood sample from a local area hospital;

3) That Sgt. Murphy worked poorly with his subordinates and was a poor supervisor;

4) That Sgt. Murphy had engaged in "silent insolence" in the context of a hostile work environment complaint when Sgt. Murphy was merely trying to avoid a confrontation with aggressive and belligerent officers;

5) That defendants reported and caused an unwarranted criminal investigation of Sgt. Murphy.

361. As a direct and proximate result of defendant's false statements and/or defendant's reckless disregard for the truth, plaintiff has suffered personal humiliation, mental anguish and damage to his reputation and standing in the community.

362. As a result of Defendant's knowingly false statements, plaintiff's professional career, and thus his livelihood, has been irreparably damaged.

363. Sgt. Murphy's reputation was permanently harmed both in the law enforcement community and elsewhere, he has been deprived of promotions, overtime and other monetary benefits and his future prospects for employment have been severely harmed.

364. Defendant's false statements herein were made maliciously and/or recklessly, entitling Plaintiffs to recover compensatory and punitive damages from the Defendants.

**NINTH CAUSE OF ACTION**
**CONSPIRACTY TO DEFAME, DEFAMATION PER SE,**
**SLANDER, LIBEL AGAINST DEFENDANTS ONONDAGA COUNTY,**
**THE ONONDAGA COUNTY SHERIFF'S DEPARTMENT, EUGENE**
**CONWAY, JOSEPH CICIARELLI, MICHAEL DICKINSON, JAMMIE**
**BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO, ROY GRATIEN,**
**JASON CASSALIA, CARL HUMMEL, WILLIAM FITZPATRICK,**
**MELLANIE S. CARDEN, LINDSEY LUCZKA, BRYAN ESWARDS and**
**WESTCOTT EVENTS all individually as well as in their capacities as**
**employees of Onondaga County and the Onondaga County Sheriff's**
**Department.**

365. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

366. Defendants agreed between themselves that, in order to retaliate against Sgt. Murphy, they would propagate various falsehoods as to his incompetence and unprofessional conduct.

367. On several occasions after the issue arose of possible illegal acts and violations related to various Sheriff's Deputies under their command, defendants maliciously and willfully defamed the Plaintiffs by making statements which they knew to be false.

73

368. Said statements were, by agreement, published to third parties both verbally and in writing.

369. Said statements were made both intentionally, with the specific intent to injure Sgt. Murphy, and negligently.

370. Said statements were meant to maliciously degrade, humiliate and harm Sgt. Murphy, to cause him to retire prematurely, to hurt his reputation in the law enforcement community and to cover-up the illegal and improper activities that Sgt. Murphy had brought to light.

371. Said statements were made with malicious disregard for the truth.

372. Said statements were made without Sgt. Murphy's knowledge or consent.

373. As a direct and proximate result of defendant's false statements and/or defendant's reckless disregard for the truth, plaintiffs has suffered personal humiliation, mental anguish and damage to his reputation and standing in the community.

374. As a result of Defendant's knowingly false statements, plaintiff's professional career, and thus his livelihood, has been irreparably damaged.

375. Sgt. Murphy's reputation was permanently harmed both in the law enforcement community and elsewhere, he has been deprived of promotions,

overtime and other monetary benefits and his future prospects for employment have been severely harmed.

376. Defendant's false statements herein were made maliciously and/or recklessly, entitling Plaintiffs to recover compensatory and punitive damages from Defendants Onondaga County and the Onondaga County Sheriff's Department.

377. In particular, and as an example of an overt act, defendants spread rumors indicating that Sgt. Murphy routinely interfered with the investigations of other officers.

378. As a further example of an overt act, defendants spread rumors indicating that Sgt. Murphy did not supervise his subordinate officers well.

379. As a further example of an overt act, defendants spread rumors indicating that Sgt. Murphy himself caused the illegal seizure of a defendant's blood as more specifically depicted above.

380. As a further example of an overt act, defendants officially complained of "silent insolence" in the context of a hostile work environment complaint when Sgt. Murphy was merely trying to avoid a confrontation with aggressive and belligerent officers.

381. As a further example of an overt act, defendants caused a criminal investigation of Sgt. Murphy.

382. As a direct and proximate result of defendant's agreement to make false statements and/or defendant's agreement to recklessly disregard the truth, plaintiff has suffered personal humiliation, mental anguish and damage to his reputation and standing in the community.

383. As a result of Defendant's agreement to knowingly make false statements, plaintiff's professional career, and thus his livelihood, has been irreparably damaged.

384. Sgt. Murphy's reputation was permanently harmed both in the law enforcement community and elsewhere, he has been deprived of promotions, overtime and other monetary benefits and his future prospects for employment have been severely harmed.

385. Defendant's false statements herein were made maliciously and/or recklessly, entitling Plaintiffs to recover compensatory and punitive damages from the Defendants.

**TENTH CAUSE OF ACTION**
**INTENTIONIAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANTS ONONDAGA COUNTY, THE ONONDAGA**
**COUNTY SHERIFF'S DEPARTMENT, EUGENE CONWAY, JOSEPH**
**CICIARELLI, MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN**
**ANDERSON, JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA and**
**CARL HUMMEL, all individually as well as in their capacities as employees**
**of Onondaga County and the Onondaga County Sheriff's Department.**

386. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

387. By the actions described above, the Defendants engaged in extreme and outrageous conduct, which intentionally caused severe emotional distress to Plaintiff.

388. Defendants intended to cause, or disregarded the substantial probability of causing, severe emotional distress upon the plaintiff, Sgt. Murphy.

389. The acts and conduct of the defendants were the direct proximate cause of injury and damage to the Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the United States and the State of New York.

77

390. Sgt. Murphy has suffered severe emotional distress as illustrated by his medical care as noted above and his ongoing treatment.

391. Overt acts which comprise examples of the efforts of the defendants are as follows:

1) Sgt. Murphy was not allowed to appear in public in uniform.

2) Sgt. Murphy was not allowed to supervise patrol officers.

3) Sgt. Murphy was not allowed to do police work.

4) Sgt. Murphy was required to sit at a desk all day, with no work, while others looked on.

5) Sgt. Murphy was wrongly passed over for promotion in favor of an officer     with less experience.

6) Sgt. Murphy's wife was assaulted without the Department so much as instituting an investigation.

392. Sgt. Murphy's suffering due to severe emotional distress continues to this day and is expected to continue into the future.

**ELEVENTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANTS ONONDAGA COUNTY, THE ONONDAGA**
**COUNTY SHERIFF'S DEPARTMENT, EUGENE CONWAY, JOSEPH**
**CICIARELLI, MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN**
**ANDERSON, JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA,**
**CARL HUMMEL, WILLIAM FITZPATRICK, MELLANIE S. CARDEN**
**AND LINDSEY LUCZKA all individually as well as in their capacities as**
**employees of Onondaga County and the Onondaga County Sheriff's**
**Department.**

393. Plaintiffs hereby incorporate by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

394. The conduct of the Defendants as described above is, and was, outrageous and far beyond the norms of civilized and professional conduct.

395. Defendants had a duty not only to avoid such conduct but, to conduct themselves in a civilized and professional manner.

396. Defendants negligence was the direct and proximate cause of Sgt. Murphy's emotional distress and evidenced by his need for medical care as noted above and his continuing treatment.

397. Sgt. Murphy has been the recipient of severe emotional distress as illustrated by his medical care as noted above and his ongoing treatment.

398. Sgt. Murphy's suffering due to severe emotional distress continues to this day and is expected to continue into the future.

399. As a result of the foregoing, Plaintiff endured, and continues to endure, serious and prolonged pain, suffering, trauma, psychological and emotional injury.

**WHEREFORE**, Plaintiffs demand judgment in an amount which will fairly and adequately compensate him for his injuries, damages, suffering and losses, in an amount that exceeds the jurisdictional limits of all lower Courts, together with the costs and disbursements of this action, including attorneys' fees and costs, punitive damages and such other and further relief as the Court may deem just and proper.

Dated: June 7, 2019

**S/ Jeffrey Parry**

_____

Jeffrey R. Parry
Bar Roll No.: 508023
*Attorney for the Plaintiff*
7030 East Genesee Street
Fayetteville, New York 13066
Tel. No.: (315) 424-6115
JeffreyParry404@gmail.com

JARROD W. SMITH, ESQ., P.L.L.C.

*JW Smith*

_____
Jarrod W. Smith, Esq.
Bar Roll No.: 512289
*Co-Counsel for Plaintiff*
11 South Main Street
P.O. Box 173
Jordan, New York 13080
Tel. No.: (315) 277-5370
jarrodwsmithesqpllc@gmail.com