UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEVIN MURPHY,

                Plaintiff,

        -v-                  5:18-CV-1218

ONONDAGA COUNTY,
THE ONONDAGA COUNTY
SHERIFF'S DEPARTMENT,
EUGENE CONWAY, MICHAEL
DICKINSON, JAMMIE BLUMER,
JONATHAN ANDERSON,
JOSEPH PELUSO, ROY
GRATIEN, CARL HUMMEL,
WILLIAM FITZPATRICK,
MELANIE S. CARDEN,
and LINDSEY M. LUCZKA,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:              OF COUNSEL:

OFFICE OF JEFFREY R. PARRY    JEFFREY R. PARRY, ESQ.
Attorneys for Plaintiff
7030 East Genesee Street
Fayetteville, NY 13066

OFFICE OF JARROD W. SMITH    JARROD W. SMITH, ESQ.
Attorneys for Plaintiff
11 South Main Street
P.O. Box 173
Jordan, NY 13080

ONONDAGA COUNTY                    JOHN E. HEISLER, JR., ESQ.
   DEPARTMENT OF LAW
Attorneys for Defendants Onondaga
   County, Onondaga County Sheriff's
   Department, Hummel, Fitzpatrick,
   Carden, and Luczka
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

COSTELLO, COONEY &                ROBERT J. SMITH, ESQ.
   FEARON, PLLC                   ELIZABETH A. HOFFMAN, ESQ.
Attorneys for Defendants Conway,  KELLY JOSEPH PARE, ESQ.
   Dickinson, Blumer, Anderson,
   Peluso, and Gratien
211 West Jefferson Street
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

On October 11, 2018, plaintiff Kevin Murphy ("Murphy" or "plaintiff"), a
retired sergeant with the Onondaga County Sheriff's Department, filed this
civil action alleging that high-ranking personnel in the Sheriff's Department
and in other County leadership positions retaliated against him for reporting,
or otherwise speaking out about, certain unlawful or inappropriate incidents
that took place during his tenure as a Sheriff's Department employee.

Plaintiff's eleven-count amended complaint[1] alleged federal claims under 42 U.S.C. §§ 1983 and 1985, the civil provision of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, and related New York law against the County of Onondaga (the "County"), the County Sheriff's Department (the "Sheriff's Department"), County Sheriff Eugene Conway ("Sheriff Conway"), Chief Police Deputy Joseph Ciciarelli ("Chief Police Deputy Ciciarelli"), Captain Michael Dickinson ("Captain Dickinson"), Lieutenant Jammie Blumer ("Lt. Blumer"), Lieutenant Jonathan Anderson ("Lt. Anderson"), Sergeant Joseph Peluso ("Sgt. Peluso"), Assistant Chief Roy Gratien ("Ass't Chief Gratien"), Undersheriff Jason Cassalia ("Undersheriff Cassalia"), Acting Personnel Commissioner Carl Hummel ("Commissioner Hummel"), District Attorney William Fitzpatrick ("DA Fitzpatrick"), Administrator Stefano Cambareri ("Administrator Cambareri"), Assistant DA Melanie S. Carden ("ADA Carden"), Assistant DA Lindsey M. Luczka ("ADA Luczka"), a private individual named Bryan Edwards ("Edwards"), and his company, Westcott Events, LLC ("Westcott Events").

On March 18, 2022, Senior U.S. District Judge Gary L. Sharpe issued a 62-page Decision & Order that cleaned up a blizzard of motion practice filed by several of the defendants and by plaintiff himself.  Dkt. No. 174; *Murphy*

---

[1] For reasons explained in Judge Sharpe's March 18, 2022 Decision & Order, plaintiff's amended complaint (Dkt. No. 60) is the operative pleading in this action.

*v. Onondaga County*, 2022 WL 819281 (N.D.N.Y.).  Judge Sharpe's Order left

a few of plaintiff's claims remaining against a subset of named defendants:

> (1) § 1983 First Amendment retaliation claim(s) against the County, the Sheriff's Department, Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, Ass't Chief Gratien, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Three and Four);

> (2) state-law claims for defamation, defamation per se, libel, and slander, and conspiracy to commit those state-law torts, against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Eight and Nine);

> (3) a state-law claim for intentional infliction of emotional distress against the County, the Sheriff's Department, and Commissioner Hummel (Count Ten); and

> (4) a state-law claim for negligent infliction of emotional distress against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Count Eleven).

Dkt. No. 174.  At that time, Judge Sharpe also dismissed Chief Police Deputy

Ciciarelli, Undersheriff Cassalia, Administrator Cambareri, Edwards, and

Westcott Events as defendants in this action.  *Id.*  Thereafter, the remaining

parties completed discovery.  The remaining defendants break down into two

camps: (a) Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt.

Peluso, and Ass't Chief Gratien (collectively the "Sheriff's defendants"); and

(b) the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (the "County defendants").

On May 5, 2023, the first camp; *i.e.*, the Sheriff's defendants, moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on the remaining claims asserted against them; *i.e.*, the § 1983 First Amendment retaliation claims in Counts Three and Four.  Dkt. No. 202.  The second camp; *i.e.*, the County defendants, filed a notice of non-opposition, Dkt. No. 203, and have not participated in the briefing on this motion.

After the Sheriff's defendants' motion for summary judgment was fully briefed, Dkt. Nos. 206, 208–209, 211, the case was reassigned to this Court for a decision, Dkt. No. 212.  The motion will be decided on the basis of the submissions without oral argument.

## II. <u>BACKGROUND</u>

In October of 1990, the Sheriff's Department hired Murphy to work as a deputy road patrol officer. Defs.' Facts ¶¶ 1–2.  Plaintiff worked in that role until February of 2000, when he was promoted to the rank of road patrol sergeant.  *Id*. ¶ 2.  As a road patrol sergeant, plaintiff's job responsibilities "in general terms, [were] to review the work of the deputies assigned to ensure the policies and procedures [were] adhered to, criminal investigations [were] followed up on, and the public [was] served."  *Id*. ¶ 3.  In addition, plaintiff supervised the road patrol deputies and reviewed accident reports.  *Id*. ¶ 4.

It was also plaintiff's responsibility to "know and adhere to the policies and procedures of the Sheriff's Department" and to "identify those times in which the policies are violated and make notification to [his] immediate chain of command, which [he] did." Defs.' Facts ¶ 5. During plaintiff's tenure as a road patrol sergeant, he became aware of "improprieties" that he reported to his supervisors. *Id.* ¶ 6. Plaintiff contends that one or more of the named defendants retaliated against him after he made these or other reports.

### 1. **November of 2008 – A suicide at the Jail**

First, in November of 2008, an individual committed suicide at the Justice Center. Defs.' Facts ¶ 7. Plaintiff believed that a medical director involved in reviewing the suicide altered the inmate's medical records. *Id.* ¶ 8. Plaintiff reported this belief to his supervisor. *Id.* ¶¶ 8–9. He also reported this belief to the County Attorney's Office and to the District Attorney's Office. *Id.*

Thereafter, Lt. Anderson, who was the head of the Sheriff's Department's internal affairs, investigated the incident. Defs.' Facts ¶¶ 34–37. Based on his investigation, he filed "internal charges" against plaintiff. *Id.* ¶¶ 10–11, 38–39. Those charges accused plaintiff of "failing to adhere to a written directive on the proper and safe handling of evidence." *Id.* ¶ 10. This was "because a detective under plaintiff's supervision did not properly secure the original medical records from the suicide incident." *Id.*

However, Lt. Anderson was not responsible for determining whether or not plaintiff would face any discipline as a result of this investigation.  Defs.' Facts ¶ 40.  Nor did Lt. Anderson play any role in determining whether or not plaintiff should or should not be promoted at any time.  *Id.* ¶ 43.  As relevant here, Lt. Anderson never disciplined plaintiff, did not supervise plaintiff, and was not involved in assigning plaintiff any job duties.  *Id.* ¶ 44.  Other than this investigation into the suicide that happened at the jail, Lt. Anderson was not involved in plaintiff's employment in any way.  *Id.* ¶¶ 41, 45.

Ass't Chief Gratien was also involved in the investigation into this suicide incident.  Defs.' Facts ¶ 58.  Plaintiff believes that Ass't Chief Gratien "made comments to a captain stating plaintiff 'interfer[ed] [*sic*] with investigations' and that was why plaintiff was not being promoted."  *Id.* ¶ 60.  But it is unclear if, when, or to whom any such statements were made.  *Id.* ¶¶ 61–62.

### 2.  <u>The Timber Tavern Incident – May of 2015</u>

Second, on May 30, 2015, an African-American woman complained to the Sheriff's Department about an incident that occurred at the Timber Tavern Bar.  Defs.' Facts ¶ 13.  Plaintiff believed that this incident was not properly addressed or investigated by the department.  *Id.*  Plaintiff was not assigned to this incident.  *Id.* ¶ 14.  Even so, plaintiff performed his own investigation into what happened.  *Id.*  Plaintiff notified his commanding officers about the "Timber Tavern incident" and explained that he believed that the incident

had been improperly investigated.  *Id*. ¶ 15.  Plaintiff believes he was denied a promotion as a result of his reports about this incident.  *Id*. ¶¶ 21, 23.

### 3.  <u>The Holding Cells & A Suspect's Blood Draw – April of 2016</u>

Third, in April of 2016, plaintiff believed that temporary holding cells at the Justice Center were being used to hold prisoners in violation of a certain department policy.  Defs.' Facts ¶¶ 16–17.  Plaintiff reported this to Sheriff Conway and raised it "internally in front of other sergeants and lieutenants as well as the chain of command in the jail."  *Id*. ¶ 17.

Fourth, a few weeks later on April 23, 2016, plaintiff learned about an "unconstitutional search and seizure of a suspect's blood."  Defs. Facts ¶ 18.  Plaintiff notified his chain of command about this event.  *Id*.  Lt. Blumer issued a police report about the suspect's blood draw that plaintiff believed to be false.  *Id*. ¶¶ 48–49.  Plaintiff believes he was denied a promotion as a result of his report about this incident.  *Id*. ¶ 21.  However, Lt. Blumer never supervised plaintiff or had any other authority over the terms and conditions of plaintiff's employment.  *Id*. ¶¶ 50–51, 54.

### 4.  <u>Sgt. Peluso & Schedule Changes – August of 2016</u>

Plaintiff also contends that Sgt. Peluso retaliated against him by yelling and screaming at him on several occasions.  *See* Defs.' Facts ¶ 72.  Notably, Sgt. Peluso filed a complaint against plaintiff in 2016.  *Id*. ¶ 75.  Plaintiff contends that this was an attempt to block him from getting promoted.  *Id*.

Ass't Chief Gratien acknowledges that he and Captain Dickinson altered plaintiff's and Sgt. Peluso's work schedules so that their shifts no longer overlapped with each other. Defs.' Facts ¶¶ 66–67. However, Ass't Chief Gratien never disciplined plaintiff for any reason. *Id*. ¶ 69. Instead, a memo was prepared to reflect the changes. *Id*. ¶¶ 76–78.

Captain Dickinson interviewed Sgt. Peluso, plaintiff, and both of their direct supervisors to determine what, if anything should be done. Defs.' Facts ¶¶ 79, 89–93. Shortly after Sgt. Peluso's schedule was adjusted, he retired from the road patrol unit. *Id*. ¶ 82.

Sgt. Peluso did not have the authority to supervise, discipline, recommend, authorize, or otherwise approve any employment actions against plaintiff, who was a fellow sergeant. Defs.' Facts ¶¶ 73, 80. Nor did Sgt. Peluso speak to anyone outside the Sheriff's Department to try to influence any decisions about plaintiff's duties or responsibilities. *Id*. ¶ 74. Sgt. Peluso never sat on any promotion panel and never discussed with anyone about whether or not plaintiff should be promoted. *Id*. ¶ 83.

## 5. **Errata & Other Named Defendants**

Plaintiff's direct supervisor is not a defendant in this litigation. Defs.' Facts ¶ 52. Lt. Blumer never disciplined plaintiff. *Id*. ¶ 53. Plaintiff was never ordered not to do police work by Captain Dickinson. *Id*. ¶ 94. Instead, plaintiff was encouraged by Captain Dickinson "to refrain from involving

himself in detailed investigations" and to "instead focus on supervising and training the deputies assigned to him." *Id*. ¶ 95.

Captain Dickinson never sat on a promotions panel, played any role in determining whether or not plaintiff should be promoted, or spoke to anyone about that topic. Defs.' Facts ¶¶ 86–88, 93. Captain Dickinson never took any action against plaintiff based on any reports, comments, complaints, or notifications plaintiff made to others. *Id*. ¶ 96.

Sheriff Conway had no personal involvement in any determinations about whether or not plaintiff should be promoted. Defs.' Facts ¶ 31. Nor did Sheriff Conway speak to anyone about whether or not plaintiff should be promoted. *Id*. Sheriff Conway did not supervise the road patrol sergeants, did not assign plaintiff any job duties, and never opined on the adequacy of plaintiff's job performance. *Id*. ¶ 32. Sheriff Conway was not involved in recommending, authorizing, or approving any employment actions taken against plaintiff, and is not aware of any such actions. *Id*. ¶ 33.

In January of 2020, plaintiff retired from the Sheriff's Department and began working at Onondaga Community College. Defs.' Facts ¶ 24. He now works for the Village of Homer's Police Department. *Id*. ¶ 25.

## III.  **LEGAL STANDARD**

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is

material for purposes of this inquiry if it "might affect the outcome of the suit

under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  And a dispute of material fact is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In assessing whether there are any genuine disputes of material fact,

"a court must resolve any ambiguities and draw all inferences from the facts

in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F.

Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is

inappropriate where a "review of the record reveals sufficient evidence for a

rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of*

*Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV.  <u>DISCUSSION</u>

As a result of Judge Sharpe's March 18, 2022 Decision & Order, only the

following claims remain: (1) § 1983 First Amendment retaliation claim

against the County, the Sheriff's Department, Sheriff Conway, Captain

Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, Ass't Chief Gratien,

Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka

(Counts Three and Four); (2) state-law claims for defamation, defamation per

se, libel, and slander, and conspiracy to commit those torts, against the

County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick,

ADA Carden, and ADA Luczka (Counts Eight and Nine); (3) a state-law claim for intentional infliction of emotional distress against the County, the Sheriff's Department, and Commissioner Hummel (Count Ten); and (4) a state-law claim for negligent infliction of emotional distress against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Count Eleven).

The Sheriff's defendants have moved for summary judgment on the § 1983 First Amendment claims for workplace retaliation that remain against them in Counts Three and Four.[2]  Dkt. No. 202; *see also* Dkt. No. 174 at 59–60.

## 1.  Sheriff's Defendants' Statement of Material Facts

Before turning to the merits of the § 1983 retaliation claims, the Sheriff's defendants have requested that the Court deem admitted the facts set forth in their Statement of Material Facts.  Defs.' Reply, Dkt. No. 211 at 4 n.1.[3]

Upon review, defendants' request must be granted.  Briefly summarized, our Local Rules require the moving party to identify—in a separate document called a statement of material facts—the undisputed material facts that entitle them to judgment as a matter of law on the claim(s) or defense(s) at issue.  N.D.N.Y. L.R. 56.1(a).  In response, the party seeking to justify the

---

[2]  These § 1983 claims are also asserted against the County defendants, who have not moved.

[3]  Pagination corresponds to CM/ECF headers.

need for a trial on that claim or defense (*i.e.*, the non-movant), is supposed to respond—in a separate-but-matching document—by admitting or denying each material fact offered by the movant.  N.D.N.Y. L.R. 56.1(b).  And for each denial, the non-movant is supposed to identify the specific record evidence that creates a "genuine" dispute over that material fact.  *Id.*

The Sheriff's defendants did their part.  Dkt. No. 202-19.  They submitted a statement of material facts supported by record citations.  *Id.*  But plaintiff did not do his part in following this Local Rule.  Instead, in opposition to the Sheriff's defendants' motion for summary judgment, plaintiff has filed three things: (1) a memorandum of law, Dkt. No. 206; (2) an affidavit, Dkt. No. 208; and (3) an attorney affirmation, Dkt. No. 209.

The affidavit is sworn to by plaintiff and includes several exhibits.  Dkt. No. 208.  But these exhibits are not a sufficient response to a moving party's statement of material facts: these documents are a state-court "complaint to the New York State Commission on Judicial Conduct" against a non-party state-court judge (Ex. A), an affidavit from a non-party witness (Ex. B), and a "[t]imeline w[ith] short narratives" (Ex. C).  *Id.*

The Court has reviewed these materials.  None of these documents can be accepted as a response to the Sheriff's defendants' statement of material facts.  The "timeline"—which is the closest plaintiff comes to identifying facts that would establish his own version of events—is a narrative series of

assertions, but it is unsworn, devoid of citations to record evidence that might have been produced in discovery, and describes several events for which plaintiff would lack personal knowledge. Ex. C to Dkt. No. 2018 at 33–55.

Plaintiff's attorney affirmation is not an acceptable response, either: it includes a letter from a non-party state-court judge that plaintiff later filed a judicial conduct complaint against (Ex. A) and a letter from DA Fitzpatrick, a non-moving defendant, (Ex. B) about an investigation conducted into plaintiff that resulted in a non-prosecution decision. Dkt. No. 209.

In his memorandum of law, plaintiff refers to a "sworn rendition of the facts of this case" made by plaintiff and "proffered to the Judicial Grievance Committee." Dkt. No. 206 at 6. This reference apparently refers to Exhibit A attached to plaintiff's affidavit.

But that is not an acceptable response to the defendants' statement of material facts, either. First, it reads much more like a legal argument than a sworn affidavit. *See* Dkt. No. 208 at 4–29. Even assuming otherwise, it does not mirror the Sheriff's defendants' assertions (as the Local Rules require) and does not specifically admit, deny, or respond to any of the Sheriff's defendants' specific factual averments. *See id*.

There is no excuse for this procedural error. Plaintiff is counseled. His attorneys practice in this judicial district. They should know better than to flout basic requirements of the Local Rules. But even assuming they were

- 14 -

not otherwise on notice of this briefing requirement, defendants' statement of material facts explicitly warns plaintiff's counsel about the obligation to file a "counterstatement" of material facts. Dkt. No. 202-19 at 16. This warning language was enough to put plaintiff's counsel on notice of his obligations: it even cites the appropriate Local Rule. *Id.*

To be sure, plaintiff's memorandum of law goes on for nearly nineteen full pages telling a version of certain events that, presumably, favor plaintiff's side of this story. Dkt. No. 206 at 9–24. But notably absent from this factual recitation are <u>citations to the record</u>. *Id.* In short, none of plaintiff's filings constitute an appropriate response to defendants' statement of material facts.

When faced with a motion for summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "In order to answer that bottom-line question, the Court needs to know what issues are really in dispute, and what plaintiff's version of the proof at trial would actually look like." *Krul v. DeJoy*, –F. Supp. 3d–, 2023 WL 8449589, at *13 (N.D.N.Y. Dec. 6, 2023).

The Court cannot make this assessment without the aid of the parties. At the bare minimum, the non-movant needs to respond properly and place the movant's factual showing in dispute. That kind of bare-minimum effort is

especially important where, as here, the non-movant is the party who will bear the initial burden of proof at trial.

Presumably, some of the statements in plaintiff's memorandum of law, Dkt. No. 206 at 9–24, and some of the statements made in the grievance committee filing attached as an exhibit to plaintiff's affidavit, Dkt. No 208-1, would be within plaintiff's personal knowledge.

Plaintiff could likely testify to those facts. *See e.g.*, *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 163 (E.D.N.Y. 2012) (explaining that the relevant test is "whether a reasonable trier of fact could believe the witness had personal knowledge" of the fact at issue).

But the Court cannot just deny summary judgment based on that kind of assumption. That is why the Local Rules require the non-movant to identify (and cite, even if it is just an affidavit from plaintiff) *evidence* in the record that would establish a fact dispute worthy of a trial. In sum, plaintiff has not complied with the Local Rules governing a non-movant's response to a movant's statement of material facts. Accordingly, the Sheriff's defendants' statement of material facts will be deemed admitted.

1. **§ 1983 First Amendment Retaliation** (Counts Three and Four)

The Sheriff's defendants have moved for summary judgment on plaintiff's § 1983 First Amendment Retaliation claims against Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, and Ass't Chief Gratien.[4]

"To succeed on a First Amendment claim brought pursuant to Section 1983, a plaintiff must be able to demonstrate that (1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." *Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) (citing *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003)).

a. **Personal Involvement**

As an initial matter, nearly all of the theories under which plaintiff might still pursue a § 1983 First Amendment retaliation claim against the Sheriff's defendants fail because the admitted facts conclusively establish that they were not "personally involved" in any alleged misconduct.

A § 1983 claim requires the plaintiff to show an individual defendant's "personal involvement" in the alleged violation. *Walker v. Shult*, 365 F.

---

[4] Plaintiff has also asserted official-capacity claims against these defendants, which must be dismissed. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In short, these § 1983 official-capacity claims are redundant of the § 1983 claim(s) directly against the County. *See, e.g.*, *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 498–99 (N.D.N.Y. 2017).

Supp. 3d 266, 284 (N.D.N.Y. 2019) ("[C]onstitutional torts cannot be premised on a theory of *respondeat superior*.").  In other words, "[i]f a defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) (emphasis in original).  This basic rule applies to supervisory defendants, too.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (clarifying the "personal involvement" requirement in the context of a supervisory liability claim).

Sheriff Conway.  Plaintiff argues that:

> Amongst other things, took orders from Fitzpatrick to attack Murphy by denying him the freedom to do his job.  This turned out to be an extension of a political favor, a favor given to a Judge running for office, by the late Judge Tormey.

Pl.'s Mem., Dkt. No. 206 at 30 (internal citation omitted).[5]

This argument is far too generalized to support a claim, especially since it appears to be based on plaintiff's speculation.  Broadly speaking, plaintiff's basis for liability against Sheriff Conway seems to rely on his assertion that Sheriff Conway, by virtue of his position as the sheriff, had to "authorize any and all actions against [him]."  Defs.' Mem. at 20.

---

[5] Oddly, plaintiff's memorandum of law in opposition to summary judgment repeatedly cites to a prior, non-operative iteration of his complaint as support for these points. *See, e.g.*, Dkt. No. 206 at 30 (citing Dkt. No. 56 at *passim*).  But this is summary judgment, not a motion to dismiss, so it is unclear what plaintiff is trying to accomplish with these citations.

But this is not enough for a factfinder to conclude that he was "personally involved" in misconduct.  *See Tangreti*, 983 F.3d at 618.  Further, at his deposition, plaintiff could not recall any action taken against him in which Sheriff Conway was personally involved.  Ex. H to Pare Decl., Dkt. No. 202-9 at 29–32.  Likewise, the admitted facts establish that Sheriff Conway had no involvement in any determination about whether or not plaintiff should be promoted.  Nor did Sheriff Conway ever supervise plaintiff, assign him any job duties, opine on his job performance, or recommend, authorize, or approve any actions taken against plaintiff.

<u>Captain Dickinson</u>.  Plaintiff argues that:

> Amongst other things, ordered Murphy not to do police work in the face of Murphy's revelations of improper police conduct, brought erroneous charges and actually placed Murphy under surveillance.

Pl.'s Mem. at 31.  But the admitted facts establish that Captain Dickinson never issued that order.  Instead, the admitted facts establish that plaintiff was only encouraged by Captain Dickinson "to refrain from involving himself in detailed investigations" and to "instead focus on supervising and training the deputies assigned to him."

Further, although Captain Dickinson acknowledges that he and Ass't Chief Gratien altered plaintiff's and Sgt. Peluso's work schedules to avoid future overlap, Captain Dickinson never played any role in determining

whether plaintiff should be promoted and never took any action against plaintiff based on any reports, comments, complaints, or notifications plaintiff made to others.

Lt. Blumer.  Plaintiff argues that:

> Amongst other things, brought wrongful blame upon Murphy for his disclosure of their error in a search warrant that led to an illegal seizure of a defendant's blood.

Pl.'s Mem. at 30.  In other words, Lt. Blumer issued a police report about the suspect's blood draw that plaintiff believed to be false.  Plaintiff believes he was denied a promotion as a result of his report about this incident.  But this accusation seems wholly speculative.  And the admitted facts establish that Lt. Blumer never supervised plaintiff or had any other authority over the terms and conditions of his employment.

Lt. Anderson.  Plaintiff argues that:

> Amongst other things, brought harassing charges against Murphy for "silent insolence" in retribution to [*sic*] Murphy's influence on [Captain] Dickinson's paramour to stop their illicit affair, a matter of public concern because she was a confidential informant.

Pl.'s Mem. at 30.  In addition, plaintiff appears to rely on the fact that Lt. Anderson investigated the internal affairs matter stemming from the suicide at the jail.  But the admitted facts establish that Lt. Anderson was not responsible for deciding whether plaintiff would face any discipline, did not

play any role in deciding whether plaintiff should be promoted at any time, never disciplined plaintiff, did not supervise him, and was not involved in assigning plaintiff any duties.

Sgt. Peluso.  Plaintiff contends that:

> Amongst other things, brought wrongful blame upon Murphy for his disclosure of their error in a search warrant that led to an illegal seizure of a defendant's blood.

Pl.'s Mem. at 31.  In addition, plaintiff contends that Sgt. Peluso retaliated against him by screaming at him on several occasions.  Sgt. Peluso also filed a complaint against plaintiff in 2016 in an attempt to block him from getting promoted.  But the admitted facts establish that Sgt. Peluso did not have the authority to supervise, discipline, recommend, authorize, or otherwise approve any employment actions against plaintiff.  The facts also establish that Sgt. Peluso did not speak to anyone outside the Sheriff's Department to try to influence any decisions about plaintiff's duties or responsibilities.

Ass't Chief Gratien.  Plaintiff believes that Ass't Chief Gratien made some comments to a captain stating that plaintiff interfered with investigations and that he was involved in the internal affairs investigation into the suicide incident.  Again, however, this accusation is wholly speculative.  Although Ass't Chief Gratien acknowledges that he and Captain Dickinson altered plaintiff's and Sgt. Peluso's work schedules so that their shifts no longer

overlapped with each other, the admitted facts establish that Ass't Chief Gratien never disciplined plaintiff for any reason.[6]

### b.  Plaintiff's Speech or Expressive Conduct

Even assuming that one or more of these defendants were "personally involved," plaintiff's remaining § 1983 claims fail because the admitted facts conclusively establish that plaintiff was speaking in his capacity as a public employee.  Even viewed in the light most favorable to him, no reasonable factfinder could conclude that he was speaking as a private citizen.

First in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and again in *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court sought to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Connick*, 461 U.S. at 140 (quoting *Pickering*, 391 U.S. at 568).

On one hand, "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment."  *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).  "On the other hand, a governmental employer may impose certain restraints on the speech

---

[6]  Ass't Chief Gratien acknowledges that he sat and others sat on a promotions panel that presided over one of plaintiff's applications.  It is discussed briefly *infra*.

of its employees, restraints that would be unconstitutional if applied to the general public." *Id*.

More recently, though, in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court "narrowed [its] jurisprudence in the area of employee speech by further restricting the speech activity that is protected." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010) (cleaned up). In particular, *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 746 F.3d at 421.

Under *Garcetti*, public employees speak in their capacity as public employees, and *not* private citizens, when they "make statements pursuant to their official duties." 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at 421–22. Instead, "[i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created. *Id*. at 422.

In *Weintraub*, the Second Circuit explained that "[t]he objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" 593 F.3d at 202 (quoting *Garcetti*, 547 U.S. at 424); *see also Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) ("The inquiry into whether a

public employee is speaking pursuant to her official duties is not susceptible to a brightline rule.").

To conduct this practical inquiry, "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross*, 693 F.3d at 306. "Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." *Id.* For example, speech may be considered "pursuant to" an employee's official responsibilities if it is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (cleaned up). The same is true if the speech in question lacks a "citizen analogue"; *i.e.*, a "relevant analogue to speech by citizens who are not government employees." *Id.* at 203.

"Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25 (rejecting "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions").

Likewise, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech

into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014).  Instead, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id*.

Upon review, the application of *Garcetti* to the facts of this case leaves plaintiff's speech unprotected as a matter of law.  Even viewed in the light most favorable to him, plaintiff's "complaints, "reports," and "notifications," all of which were made to supervisors "regarding what he perceived to be improprieties within the [Sheriff's Department], were made internally and to his commanding officers, and were made pursuant to his job obligations and responsibilities as a sergeant." Defs.' Mem., Dkt. No. 202-20 at 10 (citing record evidence establishing same).

This conclusion is compelled by the fact that all of plaintiff's complaints, reports, and notifications shared the same basic features:

> (a) the reports plaintiff made were part of his job as a sergeant at the [Sheriff's Department]; (b) the persons to whom plaintiff directed the speech and complaints were his supervisors; (c) the reports resulted from special knowledge plaintiff gained through his employment; (d) the speech occurred internally within plaintiff's workplace; and (d) the speech concerned the subject matter of [plaintiff's] job, that is, to ensure deputies and other police officers followed the policies, procedures[,] and laws applicable to the [Sheriff's Department].

Defs.' Mem. at 11–12.  As the Sheriff's defendants point out, there is nothing to suggest that plaintiff ever went to the press with his concerns or otherwise engaged in any speech about these issues that might support a conclusion that this speech was made in the character of a private citizen.  *Id.* at 12–13.

In his opposition memorandum, plaintiff asserts (apparently for the first time) that he made reports or complaints to other state or federal authorities. Pl.'s Mem., Dkt. No. 206 at 24–25.  But as defendants argue in their reply, there is no <u>evidence in the existing record</u> that any of these external reports occurred.  Defs.' Reply, Dkt. No. 211 at 6.

Indeed, as defendants point out, "there is not a single reference to the FBI or State Police in plaintiff's deposition testimony," and when he was asked this question at his deposition, plaintiff "testified that each complaint he made was an internal complaint made up the chain of command to one of his supervisors."  *Id.*

In short, the record evidence conclusively establishes that plaintiff's reports, complaints, and notifications about improprieties or other improper incidents, all of which occurred during his employment at the Sheriff's Department and squarely in his role as a sergeant, occurred "pursuant to" his official duties.  Accordingly, the Sheriff's defendants are entitled to summary judgment on plaintiff's § 1983 First Amendment retaliation claims.

### c. **Adverse Action & Causation**

Even assuming that plaintiff's speech were protected under this general body of law, plaintiff's § 1983 claims would still fail because the admitted facts establish that none of the named defendants took qualifying "adverse action" against him.  But even if one or more of the defendants' actions was adverse, there is no evidence of a causal relationship between the two.

"[T]he proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)).  "In the First Amendment retaliation context, '[a]dverse employment actions include discharge, demotion, refusal to hire, refusal to promote, and reprimand.'" *Fotopoulous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 364–65 (E.D.N.Y. 2014) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995)).

Importantly, though, "a combination of seemingly minor incidents [may also] form the basis of a constitutional retaliation claim once they reach a critical mass." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (citation omitted).  As the Second Circuit has explained:

> [T]o prove a First Amendment retaliation claim in a situation other than the classic examples of termination, refusal to hire or promote, demotion, reduction in pay, and reprimand, a plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

*Amato*, 936 F. Supp. 2d at 433 (citation omitted).

To demonstrate causation, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)).

Plaintiff has identified three actions that were allegedly adverse.[7] First, he contends that he was passed over for a promotion to lieutenant in favor of other, less-qualified candidates. Second, he claims he was ordered not to do police work as a result of the notifications he made to his supervisors about

---

[7] Plaintiff's papers reference myriad other slights. *See* Pl.'s Mem. at 30–31 (repeatedly adverting to "amongst other things"). Even viewed in the light most favorable to him, those other events, viewed individually or in combination, are objectively insufficient to permit a fact-finder to conclude that the circumstances of his working environment became unreasonable inferior and adverse when compared to a typical or normal workplace.

the "improprieties" inside the Sheriff's Department.  Third, he claims he was

subjected to retaliatory investigations, including one conducted by internal

affairs shortly after the 2008 suicide incident.

Even viewed in the light most favorable him, none of these events gives

rise to a fact dispute on this element.  As the Sheriff's defendants concede,

plaintiff was passed over for promotion twice.  Defs.' Mem. at 15.  But both

times, the Sheriff's Department conducted an ordinary promotional process in

accordance with their policy that included interviews with plaintiff and other

candidates.  *Id*.  As defendants point out, Ass't Chief Gratien is also the only

named defendant who even participated in these reviews.  *Id*. at 15–16.

As to the alleged order not to do police work, the admitted facts establish

otherwise.  Captain Dickinson presided over a dispute between plaintiff and

Sgt. Peluso that led to schedule changes so that both men would avoid each

other.  At that time, Captain Dickinson only encouraged plaintiff "to refrain

from involving himself in detailed investigations" and to "instead focus on

supervising and training the deputies assigned to him."

Finally, as to the internal affairs investigation, the Sheriff's defendants

point out that the only individual involved was Lt. Anderson, who performed

an investigation but did not exercise any control over what happened as a

result of his findings.  Defs.' Mem. at 17.  Plaintiff has not clearly articulated

what, if anything, occurred as a result of Lt. Anderson's findings.

In sum, as defendants argued in their opening brief:

> The record is devoid of evidence establishing that
> plaintiff suffered an adverse employment action.  It is
> clear from plaintiff's testimony that he was not
> pleased that he was not promoted, he was not happy
> his schedule changed as a result of his and Peluso's
> personal conflict, and he was not happy about being
> the subject of an internal affairs investigation in 2009
> or 2010.  However, plaintiff's dissatisfaction does not
> render these "adverse employment actions" for
> purposes of his retaliation claims.

Defs.' Mem. at 18.  To be sure, a different conclusion might be warranted on a
*disputed* fact record.  But it is impossible to conclude that a fact-finder could
side with plaintiff on his § 1983 claims in light of the facts deemed admitted
for summary judgment.  Accordingly, the Sheriff's defendants motion for
summary judgment must be granted.

## V. <u>CONCLUSION</u>

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment is GRANTED;

2.  Plaintiff's § 1983 First Amendment retaliation claims against Sheriff
Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, and Ass't
Chief Gratien are DISMISSED;

3.  The Clerk of the Court is directed to TERMINATE Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, and Ass't Chief Gratien as defendants from this action;

4.  Plaintiff's (a) § 1983 First Amendment retaliation claims against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Three and Four); (b) state-law claims for defamation, defamation per se, libel, and slander, and conspiracy to commit those state-law torts, against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Eight and Nine); (c) state-law claim for intentional infliction of emotional distress against the County, the Sheriff's Department, and Commissioner Hummel (Count Ten); and (d) state-law claim for negligent infliction of emotional distress against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Count Eleven) REMAIN FOR TRIAL.

  IT IS SO ORDERED.


David N. Hurd
U.S. District Judge

Dated:  February 28, 2024
        Utica, New York.