UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEVIN MURPHY,

                    Plaintiff,

          -v-                          5:18-CV-1218

ONONDAGA COUNTY,
THE ONONDAGA COUNTY
SHERIFF'S DEPARTMENT,
CARL HUMMEL, WILLIAM
FITZPATRICK, MELANIE S.
CARDEN, and LINDSEY M.
LUCZKA,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                    OF COUNSEL:

OFFICE OF JEFFREY R. PARRY      JEFFREY R. PARRY, ESQ.
Attorneys for Plaintiff
7030 East Genesee Street
Fayetteville, NY 13066

OFFICE OF JARROD W. SMITH       JARROD W. SMITH, ESQ.
Attorneys for Plaintiff
11 South Main Street
P.O. Box 173
Jordan, NY 13080

ONONDAGA COUNTY                 JOHN E. HEISLER, JR., ESQ.
    DEPARTMENT OF LAW
Attorneys for Defendants
421 Montgomery Street, 10th Floor
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

## **DECISION and ORDER**

## I. **INTRODUCTION**

On October 11, 2018, plaintiff Kevin Murphy ("Murphy" or "plaintiff"), a retired sergeant with the Onondaga County Sheriff's Department, filed this 42 U.S.C. § 1983 action. Dkt. No. 1. Although plaintiff repeatedly sought to amend his pleading at various points in this litigation, Dkt. Nos. 50, 53, 56, 58, the common thread running through every iteration he has presented to this Court has been roughly the same: that high-ranking individuals in the Sheriff's Department and in other County leadership positions committed a laundry list of civil rights violations against him. Dkt. No. 60.

On March 18, 2022, Senior U.S. District Judge Gary L. Sharpe, to whom this case was initially assigned, issued a thorough, 62-page Decision & Order that substantially narrowed the claims and issues. Dkt. No. 174. As relevant here, Judge Sharpe's Order left only a few of the civil rights claims remaining against a few of the originally named defendants:

> (1) § 1983 First Amendment retaliation claim(s) against the County, the Sheriff's Department, Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, Ass't Chief Gratien, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Three and Four);

(2) state-law claims for defamation, defamation per se, libel, and slander, and conspiracy to commit those state-law torts, against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Eight and Nine);

(3) a state-law claim for intentional infliction of emotional distress against the County, the Sheriff's Department, and Commissioner Hummel (Count Ten); and

(4) a state-law claim for negligent infliction of emotional distress against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Count Eleven).

*Id.*

Thus, in the wake of Judge Sharpe's March 18, 2022 Order, the remaining defendants could be broken down into two distinct camps: (a) Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, and Ass't Chief Gratien (the "Sheriff's defendants"); and (b) the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (the "County defendants").

On May 5, 2023, the first camp, *i.e.*, the Sheriff's defendants, moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on the claims remaining against them; *i.e.*, the § 1983 First Amendment retaliation claims in Counts Three and Four. Dkt. No. 202. The second camp; *i.e.*, the County defendants, filed a notice of non-opposition, Dkt. No. 203, and did not

participate in the briefing.  Thereafter, the Sheriff's defendants' motion for summary judgment was briefed, Dkt. Nos. 206, 208–209, 211, and eventually reassigned to this Court on February 16, 2024, Dkt. No. 212.

On February 28, 2024, the Sheriff's defendants' motion was granted.  Dkt. No. 213.  There, the Court deemed defendants' statement of material facts admitted because plaintiff had failed to properly oppose it in accordance with the Local Rules.  *Id*. at 12–17.  Those undisputed facts, even when analyzed in light of the other materials that had been offered by plaintiff, established that none of the Sheriff's defendants were "personally involved" in conduct that would be actionable under § 1983 as retaliation.  *Id*. at 17–22.

Further, to the extent that one or more of the Sheriff's defendants might have been "personally involved" in certain events identified by plaintiff, the undisputed facts established as a matter of law that he was not speaking in his capacity as a "private citizen" at the relevant time.  Dkt. No. 213 at 22–26.  Finally, even if plaintiff might have been speaking as a "private citizen" at the relevant time, the undisputed facts still established that he could not establish the other elements of his § 1983 claims.  *Id*. at 27–30.  Accordingly, the Sheriff's defendants were dismissed from this action.  *Id*. at 31.

But that did not end this case.  The second camp of defendants; *i.e.*, the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka, remained.  These defendants have basically

been bystanders to this litigation: they did not move to dismiss, *see* Dkt. No. 174, or engage in the summary judgment briefing, Dkt. No. 203. As a result, plaintiff's § 1983 retaliation claim (and some state-law claims for defamation and emotional distress) remained pending against some or all of them.

On February 28, 2024, right after granting summary judgment to the Sheriff's defendants, this Court directed plaintiff to explain why the <u>§ 1983 retaliation claims</u> should not be dismissed against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka, too. Dkt. No. 214. As the Court explained:

> Upon review, plaintiff's § 1983 retaliation claims appear to be subject to dismissal against these defendants for substantially the reasons articulated in the February 28, 2024 Decision & Order. Plaintiff's filings indicate that DA Fitzpatrick, at Sheriff Conway's request, conducted an investigation into him. Dkt. No. 209-2. Plaintiff's amended complaint alleges this investigation was "unwarranted," Dkt. No. 60 ¶ 234, and that there was no probable cause to charge him, *id.* ¶ 236. But plaintiff's own filings tend to establish that he was not charged. Dkt. No. 209-2. In addition, plaintiff has not identified how this allegedly adverse action was causally related to any protected speech.
>
> Plaintiff has even less to say about the other defendants. The amended complaint alleges that defendant Hummel was notified of certain events, including plaintiff's dispute with Sgt. Peluso, which Hummel allegedly failed to investigate. Dkt. No. 60 ¶¶ 129, 138, 222. The pleading mentions that defendant Carden called plaintiff's wife to discuss an investigation and a "possible arrest," *id.* ¶ 243, and

alleges that defendant Luczka sent him a grand jury target letter, *id*. ¶ 235.

But these allegations, even if true, would not establish a § 1983 retaliation claim. Plaintiff's deposition testimony barely mentions these defendants at all. And in the absence of an underlying constitutional violation by any of the Sheriff's Office defendants (who have all been dismissed), a § 1983 municipal-liability claim against the County and/or the Sheriff's Department is clearly subject to dismissal.

In short, it is hard to see how any of these defendants could have been "personally involved" in any conduct actionable under § 1983, let alone how any § 1983 claim against them would survive a straightforward application of qualified immunity.

Dkt. No. 214. Accordingly, plaintiff was given twenty-one days in which to Show Cause, in writing, why the § 1983 retaliation claims should not be dismissed against the County defendants. *Id*.

Thereafter, plaintiff requested a two-week extension of time to respond and permission to file a twenty-page memo of law in support of his remaining § 1983 claim against the County defendants. Dkt. No. 215. That request was denied. Dkt. No. 216.

Plaintiff soon filed a second letter motion, this time seeking only a one-week extension of time. Dkt. No. 217. In this second letter, plaintiff insisted that "[j]ustice in this matter cannot be had without a few more days" and "promise[d] [ ] a very cogent and compelling analysis of the constitutional infractions involved as well as a clear explanation as to why qualified

immunity does not apply." Dkt. No. 217.  Accordingly, this second letter

motion was granted.  Dkt. No. 218.

On March 27, 2024, plaintiff filed an 816-page response to the Show-Cause

Order.  Dkt. No. 219.  Upon review, the Court will decide the matter on the

basis of the submissions without a response from the County defendants.

## II.  <u>BACKGROUND</u>

For reasons discussed in more detail *infra*, this background is taken <u>solely</u>

from plaintiff's statement of material facts, Dkt. No. 219-2, to the extent that

each fact is supported by record evidence cited in that document.

In October of 1990, the Sheriff's Department hired plaintiff as a deputy

road patrol officer.  Pl.'s Facts ¶¶ 1–2.  Plaintiff was promoted to the rank of

road patrol sergeant in February of 2000.  *Id.* ¶ 2.  In that role, plaintiff's job

duties were to review the work of his deputies, to ensure that the Sheriff's

Department's policies and procedures were being followed, and to make sure

that criminal investigations were followed up on.  *Id.* ¶¶ 3–4.  During his

time as a sergeant, plaintiff became aware of several "improprieties" in the

Sheriff's Department.  *Id.* ¶ 5.  He reported them to his supervisors.  *Id.* ¶ 6.

According to plaintiff:

> 1.  He became "concerned" that a medical director at
> the jail had withheld certain medical records.  Pl.'s
> Facts ¶ 7.  He reported it to his supervisor.  *Id.*  He
> also reported it to the County Attorney's Office and the
> District Attorney's Office.  *Id.*  According to plaintiff,

"[d]efendants" retaliated against him by removing him from the investigation and "bringing charges," but he was later cleared of any wrongdoing.  *Id*. ¶ 9.

2.  He learned that a citizen complaint involving the "illegal" use of a taser had been mishandled by an investigating sergeant.  Pl.'s Facts ¶ 10.  He learned about the issue, followed up on the matter, completed the investigation, and made an arrest.  *Id*.

3.  He reported to the Sheriff about the improper use of holding cells at the jail.  Pl.'s Facts ¶¶ 11–12.  According to plaintiff, the use of these cells violated law and policy.  *Id*.

4.  He learned about an unconstitutional blood draw, which he also reported to his supervisors.  Pl.'s Facts ¶ 13.  According to plaintiff, this could have been avoided by following certain recommendations.  *Id*. ¶ 14.  But "defendants" blamed him for it.  *Id*. ¶ 15.

Plaintiff says he was denied a promotion for making these reports.  Pl.'s Facts ¶ 16.  Plaintiff also says he was ordered not to do certain police work by Captain Dickinson, who has already been dismissed.  *Id*. ¶¶ 17–18.

On November 16, 2018, New York Fifth Judicial District Administrative Judge James Tormey composed a letter to DA Fitzpatrick accusing plaintiff of possible misconduct.  Pl.'s Facts ¶¶ 20–22.  Judge Tormey's letter, which also referenced this federal lawsuit, "ask[ed] for a[n] investigation as to whether any 'criminal improprieties' occurred."  *Id*. ¶¶ 23, 28.  According to plaintiff, DA Fitzpatrick met with Sheriff Conway a few days later.  *Id*. ¶ 29.

Thereafter, DA Fitzpatrick, with the assistance of ADA Luczka and ADA Carden, authored a letter stating that plaintiff abused his power and should not have been involved in a certain incident (that plaintiff does not describe in any detail in his current statement of material facts) because "his wife was involved." Pl.'s Facts ¶¶ 30–34, 41, 42, 45.

DA Fitzpatrick's letter "threaten[ed]" to place plaintiff on the so-called "Giglio list." Pl.'s Facts ¶ 36. But DA Fitzpatrick ultimately "decline[d] to prosecute" plaintiff. *Id.* ¶ 37. Instead, DA Fitzpatrick "recommend[ed]" that plaintiff "not be assigned to handle any significant case." *Id.* ¶ 38. According to plaintiff, ADA Luczka and her supervisor, ADA Carden, knew there was no probable cause to charge plaintiff with any crime. Pl.'s Facts ¶¶ 43, 46. But they tried to "blame" plaintiff anyway. Pl.'s Facts ¶ 47. Plaintiff retired from the Sheriff's Department in January of 2020. *Id.* ¶ 19.

## III. LEGAL STANDARD

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV.  DISCUSSION

As an initial matter, plaintiff's filings raise two housekeeping matters that impact the legal analysis. The Court's Show-Cause Order included some explicit instructions:

> 3.  Plaintiff's evidentiary submission must conform to Local Rule 56.1, which governs a party's statement of material facts; *i.e.*, each fact on which plaintiff relies to establish his claim against one or more of these defendants must be supported by a specific citation to the record that would be sufficient to establish the cited fact at a trial;
>
> 4.  Plaintiff may also submit a memorandum of law, not to exceed ten pages in length, in response to this Order to Show Cause[.]

Dkt. No. 215 at 5–6.

First, plaintiff did not submit any memorandum of law in accordance with paragraph number four. Instead, he has just filed a letter explaining that he "elected not to" file a supporting memo of law, but that it has "occur[red] to

[him] that the Court may wish" to hear some legal analysis "having now seen the evidence."  Dkt. No. 220.  That invitation will be declined.  Plaintiff had an opportunity to file a supporting memo of law, was given an extension of time, and still elected not to do so.  There is no reason to second-guess this decision by plaintiff's counsel.

Second, plaintiff's statement of material facts does not precisely conform with Local Rule 56.1 in accordance with <u>paragraph number three</u>.  Although plaintiff's submission matches the *form* of Local Rule 56.1, it does not appear to offer a complete version of the events relevant to his § 1983 claim; *i.e.*, it does not set forth "each fact on which plaintiff relies to establish his claim against one or more of these defendants."

This makes the analysis more difficult.  On summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *Anderson*, 477 U.S. at 252.

But in order to answer that bottom-line question, the Court needs to know what plaintiff's version of the proof at trial would be.  To that end, Local Rule 56.1 instructs a party to put their version of events into a single document: "a statement of material facts."  That document, in turn, must be supported by evidence that substantiates each fact being offered.  Importantly, though, the statement of material facts should really be self-contained: it is supposed to

"streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Plaintiff's statement of material facts presents only a haphazard recitation of salient events.  Dkt. No. 219-2.  The first half of the document refers to events that presumably involved his former employer, former supervisors, and/or former colleagues.  Pl.'s Facts ¶¶ 1–19.  But the § 1983 retaliation claims against those defendants have already been dismissed.  Dkt. No. 213.

The second half of plaintiff's statement of material facts does a little better job in the sense that it actually mentions three of the remaining defendants; *i.e.*, DA Fitzpatrick and ADAs Luczka and Carden, but it appears to be telling only half of a story: it jumps around from topic to topic without establishing a coherent thread between any specific instances of plaintiff's protected activity and any specific misconduct that could be attributed to one or more of the remaining individual defendants.  Pl.'s Facts ¶¶ 20–53.

Presumably, that narrative thread could have been developed in a memo of law.  But plaintiff chose not to file one.  Alternatively, the Court could steel its nerve and wade into the "voluminous records" that plaintiff submitted in support of his statement of material facts.  Dkt. Nos. 219 (exhibits 1 through

49).[1]  But that would defeat the explicit instructions given in the Show-Cause Order, which told plaintiff to put his own version of the relevant events into a statement of material facts that conformed with Local Rule 56.1.

After all, the Show-Cause Order emphasized that plaintiff seemed to treat the County defendants as an afterthought: there was little indication that DA Fitzpatrick or the two ADAs were "personally involved" in conduct actionable under § 1983.  This Show-Cause Order did not impose any page limit on the statement of material facts.  The idea was simple: give plaintiff a full and fair opportunity to tell his own, complete version of relevant events to see if it would sustain his burden at trial against one or more of these defendants.

Plaintiff did not do that.  Instead, plaintiff has told a partial version of the story in his statement of material facts, Dkt. No. 219-2, and invited the Court to delve into the other 810 pages of material to try to make heads or tails of the rest of the narrative.  That invitation must also be declined.  Instead, the Court will confine the legal analysis to the documents requested in the Show-Cause Order: plaintiff's statement of material facts, Dkt. No. 219-2, and a memorandum of law, which plaintiff elected <u>not</u> to file, *see* Dkt. No. 220.

---

[1]  Rather than use an attorney declaration, plaintiff has elected to introduce all of these exhibits through his own affidavit.  Dkt. No. 219.  This document contains legal argument by a non-attorney. This document also purports to introduce exhibits to which plaintiff would seem to lack personal knowledge.  This is an unusual approach.  But under modern summary judgment practice, documents need only be presented in a form that, if authenticated, *could be* admissible at trial.

A. **First Amendment Retaliation**

"To succeed on a First Amendment claim brought pursuant to Section 1983, a plaintiff must be able to demonstrate that (1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." *Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) (citing *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003)).

As an initial matter, though, plaintiff has not identified evidence from which a rational trier of fact could conclude that one or more of the remaining defendants were "personally involved" in conduct actionable under § 1983:

Commissioner Hummel. Plaintiff's statement of material facts does not make a single reference to Commissioner Hummel.

DA Fitzpatrick. Plaintiff's statement of material facts establishes that Judge Tormey, a non-party, sent a letter to DA Fitzpatrick that requested an "investigation" into plaintiff's possible misconduct. Plaintiff's statement of material facts establishes that DA Fitzpatrick later released a written determination in which he stated that plaintiff had abused his power and recommended that plaintiff not be assigned to "any significant case." But nowhere does this statement of material facts establish that DA Fitzpatrick

exercised any control over the terms and conditions of plaintiff's employment or subjected him to any specific adverse action beyond the letter itself.

ADAs Luczka and Carden.  Plaintiff's statement of material facts establish that ADAs Luczka and Carden assisted DA Fitzpatrick in this work.  Again, however, nowhere does this statement of material facts establish that either of these two ADAs exercised any control over the terms and conditions of plaintiff's employment or subjected him to any specific adverse action.

1. **Plaintiff's Speech of Expressive Conduct**

Even assuming that DA Fitzpatrick and/or ADAs Luczka or Carden were "personally involved," plaintiff's § 1983 claims against them would still fail because the only speech or expressive conduct identified by plaintiff in his statement of material facts occurred in his capacity as a public employee.

First in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and again in *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court sought to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Connick*, 461 U.S. at 140 (quoting *Pickering*, 391 U.S. at 568).

On one hand, "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment."  *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).  "On the other

hand, a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Id.*

More recently, though, in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court "narrowed [its] jurisprudence in the area of employee speech by further restricting the speech activity that is protected." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010) (cleaned up). In particular, *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 746 F.3d at 421.

Under *Garcetti*, public employees speak as public employees, and *not* as private citizens, when they "make statements pursuant to their official duties." 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22. Instead, "[i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created. *Id.* at 422.

In *Weintraub*, the Second Circuit explained that "[t]he objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" 593 F.3d at 202 (quoting *Garcetti*, 547 U.S. at 424); *see also*

*Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) ("The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule.").

To conduct this practical inquiry, "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross*, 693 F.3d at 306. "Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." *Id.* For example, speech may be considered "pursuant to" an employee's official responsibilities if it is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (cleaned up). The same is true if the speech in question lacks a "citizen analogue"; *i.e.*, a "relevant analogue to speech by citizens who are not government employees." *Id.* at 203.

"Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25 (rejecting "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions").

Likewise, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Instead, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id*.

Upon review, the application of *Garcetti* to the factual narrative set out in plaintiff's statement of material facts compels the conclusion that the speech or expressive conduct actually identified by plaintiff was unprotected as a matter of law. Even viewed in the light most favorable to him, plaintiff's complaints, reports, and notifications, which were made to his supervisors about improprieties within the Sheriff's Department that he learned about in his capacity as an employee, were made pursuant to his job obligations and responsibilities as a sergeant. Pl.'s Facts ¶¶ 3–18. Thus, because all of this activity occurred during his employment and was required by his role as a sergeant, this speech occurred "pursuant to" his official duties as a matter of law. Accordingly, plaintiff's § 1983 claim is subject to dismissal on this basis.

## 2.  <u>Adverse Action</u>

Even assuming that plaintiff's speech were protected under this general body of law, plaintiff's § 1983 claims would still fail because the facts set forth

in his statement of material facts fail to establish that any of the named defendants took any qualifying "adverse action" against him.

"[T]he proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)). "In the First Amendment retaliation context, '[a]dverse employment actions include discharge, demotion, refusal to hire, refusal to promote, and reprimand.'" *Fotopoulous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 364–65 (E.D.N.Y. 2014) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995)).

Importantly, though, "a combination of seemingly minor incidents [may also] form the basis of a constitutional retaliation claim once they reach a critical mass." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (citation omitted). As the Second Circuit has explained:

> [T]o prove a First Amendment retaliation claim in a situation other than the classic examples of termination, refusal to hire or promote, demotion, reduction in pay, and reprimand, a plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

*Amato*, 936 F. Supp. 2d at 433 (citation omitted).

Plaintiff has not established a triable issue of fact on the "adverse action" element of a § 1983 retaliation claim.  Plaintiff's statement of material facts establishes that DA Fitzpatrick received a letter from Judge Tormey that requested plaintiff be investigated.  Pl.'s Facts ¶¶ 20–31.  Although plaintiff's statement of material facts does not bother to explain the incident that led to Judge Tormey's letter (though the Court is aware that it formed the basis of other disputes earlier in this case), plaintiff complains that DA Fitzpatrick issued a written determination in response to Judge Tormey's letter that wrongfully accused plaintiff of "an outrageous abuse of power," "threaten[ed]" to place him on the Giglio list, "recommend[ed]" that he not be assigned to any significant case, but ultimately declined to prosecute him.  *Id.* ¶¶ 32–51.

Even viewed in the light most favorable to him, plaintiff cannot show that he suffered an "adverse action" as a result of these events.  Plaintiff's statement of material facts establishes that DA Fitzpatrick's investigation led to a non-prosecution decision.  Pl.'s Facts ¶ 37.  Absent some articulable basis on which to conclude otherwise, there is no indication that the fact of this investigation (conduct by an entity *other* than plaintiff's employer), or the resulting non-prosecution decision, might qualify as an "adverse" action.

Beyond the fact of this investigation and the issuance of the letter itself, the "adverse actions" identified by plaintiff might be (a) the letter's threat that plaintiff could be placed on the Giglio list, *id.* ¶ 36; and (b) the letter's recommendation that plaintiff should no longer be assigned to any significant cases, *id.* ¶ 38.

But as noted elsewhere, DA Fitzpatrick was not plaintiff's employer and there is no meaningful indication that plaintiff suffered direct consequences (employment-related or otherwise) as a result of the letter. Notably, while the statement of material facts says that plaintiff was ordered not to perform certain of his job duties, Pl.'s Facts ¶ 51, plaintiff's own version of events says that this no-work order occurred after the ill-defined "incident" (rather than after the issuance of DA Fitzpatrick's letter).

Perhaps plaintiff's best argument is that Judge Tormey issued his letter as retaliation for plaintiff's decision to file this lawsuit. But Judge Tormey is not (and never was) a party to this action. And there is no indication in the statement of material facts that DA Fitzpatrick initiated this investigation for any reason *other* than Judge Tormey's letter requesting that he do so.

## 3. **Adverse Action**

Further, even if one or more of these defendants' actions could be considered "adverse," there is no indication of any causal relationship

between any of this conduct and any of plaintiff's identified speech or expressive activity.

To demonstrate causation, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)).

Even assuming that one or more of these above-referenced actions were sufficiently "adverse" under more generous First Amendment standard, there is still no evidence of causation between these events and the "improprieties" about which plaintiff complained to his supervisors.

The alleged protected activity identified by plaintiff in his statement of material facts occurred in November of 2008, Pl.'s Facts ¶ 6, May of 2015, *id.* ¶ 10, and in April of 2016, *id.* ¶¶ 11, 13. But the letter from Judge Tormey was not issued until November 16, 2018, *id.* ¶ 21, which means any conduct by DA Fitzpatrick or the two ADAs occurred at some point after that. A span of over two years between these events is far too attenuated to create a jury question on causation.

### 4.  **The County & Sheriff's Department**

In sum, plaintiff's § 1983 First Amendment retaliation claims fail against Commissioner Hummel, DA Fitzpatrick, ADA Luczka, and ADA Carden.  In the absence of an underlying constitutional violation against one or more of these defendants, these § 1983 claims must be dismissed against the County and the Sheriff's Department too.[2]  *See, e.g.*, *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006).

### B.  **State-Law Claims**

Plaintiff's remaining claims arise under state law.  Because the parties are not diverse and jurisdiction is based on the presence of a federal question, the Court has "supplemental jurisdiction" over these state-law claims.  28 U.S.C. § 1367(a).  But supplemental jurisdiction is discretionary.  Where, as here, a plaintiff's federal claims have been dismissed before trial, the district court should decline to exercise this supplemental jurisdiction absent exceptional circumstances.  Because there are no exceptional circumstances presented in this case, these state-law claims will be dismissed without prejudice.

## V.  **CONCLUSION**

Plaintiff's § 1983 First Amendment retaliation claims against the DA, two of his assistant prosecutors, and Commissioner Hummel seemed unlikely to

---

[2]  The Sheriff's Department is just an administrative department of the County.

be viable.  Out of an abundance of caution, the Court issued the Show-Cause Order to give plaintiff an opportunity to establish that a jury trial on this claim was warranted against one or more of these defendants.  In seeking a second request for an extension of time, plaintiff "promise[d] [the Court] a very cogent and compelling analysis of the constitutional infractions involved as well as a clear explanation as to why qualified immunity does not apply."

But plaintiff did not deliver.  Instead, he declined to file a supporting memo of law with any legal analysis, compelling or otherwise.  So the Court has reviewed the statement of material facts to see whether, assumed true and viewed in the light most favorable to plaintiff, his evidentiary showing might warrant a jury trial on the § 1983 claims.  It does not.

Therefore, it is

ORDERED that

1.  Plaintiff's (a) § 1983 First Amendment retaliation claims against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Three and Four) are DISMISSED with prejudice;

2.  Plaintiff's (b) state-law claims for defamation, defamation per se, libel, and slander, and conspiracy to commit those state-law torts, against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Eight and Nine); (c) state-law claim

for intentional infliction of emotional distress against the County, the

Sheriff's Department, and Commissioner Hummel (Count Ten); and (d) state-

law claim for negligent infliction of emotional distress against the County,

the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA

Carden, and ADA Luczka (Count Eleven) are DISMISSED without prejudice;

and

3. Plaintiff's letter motion (Dkt. No. 220) is DENIED.

The Clerk of the Court is directed to terminate the pending motion, enter

a judgment accordingly, and close the file.

IT IS SO ORDERED.

Dated:  April 2, 2024
        Utica, New York.

David N. Hurd
U.S. District Judge